IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN MICHAEL WEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| v. | ) | JUDGE |
| | ) | |
| GAYLE RAY, in her official capacity as | ) | |
| Tennessee's Commissioner of Correction; | ) | **DEATH PENALTY CASE** |
| | ) | |
| RICKY BELL, in his official capacity as | ) | **EXECUTION: November 9, 2010** |
| Warden, Riverbend Maximum Security | ) | |
| Institution; | ) | |
| | ) | |
| DAVID MILLS, in his official capacity as | ) | |
| Deputy Commissioner; | ) | |
| | ) | |
| REUBEN HODGE, in his official capacity as | ) | |
| Assistant Commissioner of Operations; | ) | |
| | ) | |
| PHYSICIAN A, in his designated official | ) | |
| capacity) and JOHN DOE PHYSICIANS 1-100; | ) | |
| | ) | |
| JOHN DOE PHARMACISTS 1-100; | ) | |
| | ) | |
| IV TEAM MEMBER A, IV TEAM MEMBER | ) | |
| B, and JOHN DOE MEDICAL PERSONNEL | ) | |
| 1-100; | ) | |
| | ) | |
| EXECUTION TEAM MEMBER A, | ) | |
| EXECUTION TEAM MEMBER B, | ) | |
| EXECUTION TEAM MEMBER C, | ) | |
| and JOHN DOE EXECUTIONERS 1-100; | ) | |
| | ) | |
| JOHN DOES 1-100; | ) | |
| | ) | |
| Defendants. | ) | |

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {1}

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {3}

STATUTE OF LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {6}

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {9}

I.     PRELIMINARY STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . {14}

     A.    Defendants' Execution Protocols . . . . . . . . . . . . . . . . . . . . . . . . {15}
          i.     Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {15}
          ii.    Execution Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . {16}
     B.    DEMONSTRATED RISKS OF UNNECESSARY PAIN AND SUFFERING . . . . {21}
          i.     A History of Unnecessary Pain and Suffering Occurring in States
                  Utilizing Lethal Injection Protocols. . . . . . . . . . . . . . . . . . . . {21}
          ii.    Known risks in Tennessee's protocol and known failures of
                  persons carrying out Tennessee's lethal injection protocols. . . {34}
          iii.   Even if carried out according to the Protocol, Tennessee's lethal
                  injection procedure inflicts unnecessary and wanton pain and
                  suffering. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {35}

                  Coe Execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {36}
                  Workman Execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . {36}
                  Henley Execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {38}

          iv.    Sodium thiopental, as used in the Tennessee Protocol, does not
                  effectively establish unconsciousness. . . . . . . . . . . . . . . . . . {39}
          v.     Pancuronium bromide (Pavulon), when administered as intended,
                  is the fatal agent under the Tennessee Protocol. . . . . . . . . . . {40}
          vi.    Potassium chloride, when administered as intended, by the
                  Tennessee protocol does not induce cardiac arrest. . . . . . . . . {42}

     C.    KNOWN RISK IN TENNESSEE'S THREE-DRUG PROTOCOL . . . . . . . . . . {44}
          i.     Defendants' Procurement Of Drugs For Use Upon Plaintiff . . {44}
          ii.    Anesthesia And Consciousness With sodium thiopental . . . . . {46}
          iii.   Pancuronium bromide (Pavulon) . . . . . . . . . . . . . . . . . . . . . {51}
          iv.    Potassium chloride . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {56}
          v.     Death Under Tennessee's Lethal Injection Protocol . . . . . . . . {58}

i

D.     Tennessee's Lethal Injection Protocol is Not Substantially Similar to the Kentucky Protocol Approved by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {58}

## COUNT I

42 U.S.C. §1983: THE HISTORY AND PRACTICE OF EXECUTIONS UNDER TENNESSEE'S CURRENT PROTOCOL IS SUBSTANTIALLY DIFFERENT FROM THE PRACTICE APPROVED IN KENTUCKY BY THE UNITED STATES SUPREME COURT IN *BAZE V. REES*, 553 U.S. 35 (2008). BY ADOPTING AND CONTINUING TO USE THE CURRENT PROTOCOL, DEFENDANTS HAVE SHOWN DELIBERATE INDIFFERENCE TO THE UNNECESSARY AND WANTON INFLICTION OF PAIN AND PROLONGED DEATH AND HAVE CREATED A SUBSTANTIAL RISK OF THE UNNECESSARY AND WANTON INFLICTION OF PAIN IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS. (DEFENDANTS RAY, BELL, MILLS, AND HODGE) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {63}

## COUNT II

42 U.S.C. §1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS BY THE USE OF SODIUM THIOPENTAL PURSUANT TO THE CURRENT PROTOCOL (DEFENDANTS RAY, BELL, MILLS, HODGE JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {69}

## COUNT III

42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS BY THE USE OF PANCURONIUM BROMIDE PURSUANT TO THE CURRENT PROTOCOL (DEFENDANTS RAY, BELL, MILLS, HODGE, JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {75}

## COUNT IV

42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND TENNESSEE CONSTITUTION ARTICLE 1, § 16 BY THE USE OF POTASSIUM CHLORIDE PURSUANT TO THE CURRENT PROTOCOL (DEFENDANTS RAY, BELL, MILLS, HODGE, JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {80}

## COUNT V

42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENT THROUGH ADHERENCE TO THE CURRENT PROTOCOL WHICH FAILS TO PROVIDE ADEQUATE QUALIFICATIONS AND TRAINING OF PERSONNEL TO MINIMIZE THE KNOWN RISKS INVOLVED IN EXECUTION BY LETHAL INJECTION (DEFENDANTS RAY, BELL, MILLS, HODGE, JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE

PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {83}

## COUNT VI

42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENT THROUGH ADHERENCE TO THE CURRENT PROTOCOL WHICH FAILS TO REQUIRE AND INCLUDE, AND FAILS TO COMPORT WITH, ACCEPTED MEDICAL PRACTICES, OR BEST PRACTICES, TO MINIMIZE THE KNOWN RISKS INVOLVED IN EXECUTION BY LETHAL INJECTION (DEFENDANTS RAY, BELL, MILLS, HODGE, JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100). IN PARTICULAR, TENNESSEE'S PROTOCOL FAILS TO PROVIDE FOR A CHECK FOR THE INMATE'S LEVEL OF CONSCIOUSNESS AFTER ADMINISTRATION OF SODIUM THIOPENTAL. . . . . . . . . . . . . {88}

## COUNT VII

42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND TENNESSEE CONSTITUTION ARTICLE 1, § 16 BY THE USE OF AN EXECUTION PROTOCOL WHICH CAUSES DEATH BY THE SUFFOCATION OF A CONSCIOUS INMATE.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {97}

## COUNT VIII

*Request for Declaratory Judgment*

28 U.S.C. § 1331:    Violations of the Federal Controlled Substances Act and the
                     Federal Food, Drug and Cosmetic Act. . . . . . . . . . . . . . . . . . . {99}
                     Federal Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*,
                     (Sodium Thiopental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {100}
                     Federal Food, Drug & Cosmetic Act, 21 U.S.C. §§ 301, *et seq.*
                     (Sodium thiopental, pancuronium bromide and potassium
chloride) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {103}

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {106}

COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . {108}

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {109}

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . {113}

iii

# COMPLAINT

## INTRODUCTION

1.     Stephen Michael West is a condemned inmate.  At any execution of Mr. West by lethal injection, the State intends to use a protocol whereby he would be injected with a dose of sodium thiopental, then with a dose of pancuronium bromide (Pavulon), and third with a dose of potassium chloride.  The use of this protocol for Mr. West's execution is unconstitutional.  The persons responsible for carrying out the protocol lack the training, skill and expertise required to avoid known risks of an unnecessarily painful and prolonged death.  Even when the execution is carried out as written in Tennessee's protocol, the sodium thiopental will not sufficiently anesthetize Mr. West and the potassium chloride will not reach the site of action and/or will not reach the site of action in sufficient concentration to stop Mr. West's heart.  The use of pancuronium bromide is arbitrary; serves no legitimate interest; and unreasonably risks the infliction of psychological and physical torture by suffocation.  Pancuronium bromide causes paralysis and asphyxiation or strangulation.  The use of pancuronium bromide offends the dignity of humanity and shocks the conscience: it cannot legally be used in Tennessee to kill a dog.  The potassium chloride causes excruciating pain and will not stop the heart.  The deliberate use of this mixture of chemicals, with the known risks inherent in Tennessee's protocol creating an unnecessarily painful and prolonged death experienced without total unconsciousness, violates Mr. West's Eight and Fourteenth Amendment rights to be free from cruel or unusual punishment, as detailed *infra*.

2.     On February 1, 2007, Tennessee's Governor Phil Bredesen issued an Executive Order which (a) revoked Tennessee's "current [execution] protocols and any related procedures,

{1}

whether written or otherwise," (b) instructed the Commissioner of Correction to complete a "comprehensive review of the manner in which death sentences are administered in Tennessee," and (c) directed the Commissioner to issue new protocols and related procedures by May 2, 2007.

3.    On April 30, 2007, the Commissioner released a Report on Administration of Death Sentences in Tennessee, (Attachment A)(hereinafter "Report"), and a new protocol and procedure for execution by lethal injection and by electrocution, (Attachment B)(hereinafter "Current Protocol"). The Report declares that Tennessee "has retained a three-chemical protocol." (Attachment A, Report p.6).

4.    Plaintiff seeks temporary, preliminary, and permanent injunctive relief to prevent the Defendants from executing Plaintiff West by means of lethal injection pursuant to Tennessee's Current Protocol. This Court should declare the Current Protocol is not substantially similar to Kentucky's protocol which was reviewed by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008). This Court should declare the Current Protocol, as applied to Mr. West, unconstitutional and enjoin its use, as it is cruel or unusual punishment under the Eighth and Fourteenth Amendments. This Court should also enter a judgment declaring the use of sodium thiopental, pancuronium bromide, and potassium chloride unconstitutional and enjoin Defendants' intentions to obtain, order, write a prescription, write a physician's order, prescribe, dispense, or in any other manner transfer the three drugs in any form whatsoever to Defendant Bell or any other Defendants involved in the execution process.

{2}

## JURISDICTION AND VENUE

5.    Venue is proper in this District because Plaintiff is incarcerated at Riverbend Maximum Security Institution, in this District; the Defendants would intend to procure and inject Plaintiff with three drugs and execute him in this District; and, the events giving rise to this complaint have occurred and will occur in this District.  28 U.S.C. § 1391.

6.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), 2201 (declaratory relief), and 2202 (further relief).  This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

7.    As to exhaustion of administrative remedies, on May 7, 2007, shortly after Tennessee adopted its current protocols, Mr. West filed a grievance with Defendant Bell objecting to the use of the Current Protocol for his execution.  The next day, on May 8, 2007, the grievance was denied based on procedural defenses. (2007 Grievance denial, Attachment C). On July 15, 2010, the Tennessee Supreme Court scheduled Mr. West's execution for November 9, 2010.  On July 22, 2010, following the setting of the West's actual execution date, West filed another grievance with Defendant Bell again objecting to the use of the current protocol for his execution.  This grievance was also denied (2010 Grievance denial, Attachment D).  All administrative remedies are exhausted.

8.    This case presents a case and controversy sufficient to vest this Court with subject matter jurisdiction. On November 7, 2000, the Tennessee Supreme Court set an execution date for Mr. West on March 1, 2001.

9.    On February 13, 2001, Mr. West signed an "Affidavit to Elect Method of Execution" (hereinafter "Old Election Form")(Attachment E, Old Election Form), as required by

{3}

Tennessee's then-existing Execution Protocol (hereinafter "Old Protocol")(Attachment F, Old Protocol, at Bates p.4, 124). That form required the warden "[t]o assure condemned inmates sentenced prior to January 1, 1999, are given opportunity to select electrocution or lethal injection as legal means of execution <u>within 30 days immediately preceding the scheduled execution date</u>."

10.    Mr. West's March 1, 2001, execution was not carried out.[1]

11.    On February 1, 2007, Tennessee's Governor Phil Bredesen issued an Executive Order which (a) <u>revoked</u> current [execution] protocols and any related procedures [including the protocol under which Mr. West had been presented with, and signed whether written or otherwise]; (b) instructed the Commissioner of Correction to complete a comprehensive review of the manner in which death sentences are administered in Tennessee; (c) directed the Commissioner to issue new protocols and related procedures by May 2, 2007; and, (d) stayed the executions of Michael Joe Boyd a/k/a/ Mika'eel Abdullah Abdus-Samad, Edward Jerome Harbison, Daryl Keith Holton[2] and Pervis T. Payne. (Attachment G, Executive Order).

12.    Pursuant to the Executive Order, the Tennessee Department of Corrections issued new execution protocols for both lethal injection and electrocution on April 30, 2007. (Attachment B, Current Protocol).

13.    The Commissioner also released a Report on Administration of Death Sentences in Tennessee (Attachment A, Report). The Report declares that Tennessee "has retained a three-

---

[1]Mr. West's execution date was set prior to the expiration of the statute of limitations for the filing of a federal petition for writ of habeas corpus. Mr. West subsequently filed his habeas petition and the execution was stayed by the federal district court.

[2]Mr. Holton was scheduled for execution by electrocution.

{4}

chemical protocol." (Attachment A, Report p.6).

14.    The Current Protocol included among its forms an "Affidavit Concerning Method of Execution" (hereinafter "New Election Form"). (Attachment B, Current Protocol p.88). The New Election Form was never presented to Mr. West.

15.    On July 15, 2010, the Tennessee Supreme Court set Mr. West's execution for November 9, 2010. On September 30, 2010, Mr. West executed a rescission of his prior Affidavit in an abundance of caution. On October 12, 2010, he presented that rescission to Warden Bell. (Attachment H, Rescission).

16.    Notwithstanding that: (a) Governor Bredesen explicitly revoked the Old Election Form signed by Mr. West and all procedures by which it was to be carried out; (b) the Old Election Form, read in the context of the remainder of the Old Protocol, expired upon the passage of Mr. West's then-scheduled March 1, 2001, execution date; (c) the Old Election Form had, out of an abundance of caution, been rescinded by Mr. West; and (d) Mr. West was incompetent at the time he signed the Old Election Form, Defendants stated that they would execute Mr. West by electrocution in violation of TENN. CODE ANN.. § 40-23-114(a), in violation of the Eighth and Fourteenth Amendments to the United States Constitution (Attachment I, Debra Inglis letter of October 15, 2010).

17.    On October 20, 2010, Defendants filed a pleading in the Chancery Court for Davidson County, Tennessee, stating affirmatively that they would now accept Mr. West's recision, that Mr. West was no longer bound by Plaintiff's Attachment E, and that they would carry out Mr. West's execution by means of lethal injection.

{5}

## STATUTE OF LIMITATIONS

18.     In *Cooey v. Strickland*, 479 F.3d 412 (6th Cir. 2007), the court stated:

> On the other hand, as the Supreme Court recently made clear, federal law
> determines when the statute of limitations for a civil rights action begins to run.
> *Wallace v. Kato*, [549 U.S. 384, 388 (2007)]. "Under those principles, it is 'the
> standard rule that [accrual occurs] when the plaintiff has complete and present
> cause of action.'" *Wallace*, [549 U.S. at 388] (quoting *Bay Area Laundry & Dry
> Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201, 118
> S.Ct. 542, 139 L.Ed.2d 553 (1997)). This occurs "when 'the plaintiff can file suit
> and obtain relief.'" *Id.* (quoting *Bay Area Laundry*, 522 U.S. at 201, 118 S.Ct.
> 542).

479 F.3d at 416.

19.     Nothing in *Cooey* suggests that Mr. West's causes of action accrued before

Defendants had committed all acts necessary to establish a cause of action.

20.     The United States Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35 (2008),

held that the Eighth Amendment is violated upon two conditions. First, there must be a showing

that a State's execution protocol inflicts unnecessary pain and suffering. Second, it must be

proved that the State had actual or implicit knowledge that such pain and suffering will result

from carrying out its protocol and the State decided to go forward nonetheless, *i.e.*, the risk must

be obvious.

21.     Mr. West's claims arose only when both conditions were satisfied. In *Baze*, the

Supreme Court found that Kentucky had not committed the constitutional violations alleged

because there was no showing that State officials knew, or had reason to know, that the execution

protocol failed to properly anaesthetize condemned inmates. *Baze*, 553 U.S. at 50. Mr. West

alleges that it is only upon the accumulation of all of the evidence from recent executions,

including, specifically the evidence contained in the autopsy of Steven Henley that Defendants

{6}

knew, or had reason to know, that Tennessee's lethal injection protocol, even when administered correctly, accomplished death by paralyzing ans suffocating conscious inmates. That evidence became available on March 10, 2010, when the State released the Henley autopsy report.

22.    The risk alleged in Mr. West's Complaint did not become so clear that it could not be denied until the State received the information on March 10, 2010, which showed both: (a) that Mr. Henley was suffocated while conscious; and, (b) that the similar information in their possession regarding then execution of the only other inmate executed under the Current Protocol, was not an isolated event. It was <u>only</u> upon that date that all facts necessary to establish Mr. West's claims existed. Under *Cooey*, that is the date upon which his causes of action accrued.

23.    Furthermore, Mr. West did not have standing to challenge Tennessee's method of lethal injection at any point in time between the date he first knew the method Tennessee would carry out lethal injections and October 20, 2010.

24.    *Cooey* notes the date upon which a state adopts its method of carrying out lethal injection is the date upon which the risk of harm becomes imminent (an element of any claim seeking prospective injunctive relief). It further suggests that the date will begin to run anew when a state makes substantial changes to its method. *Cooey v. Strickland*, 479 F.3d at 423-24 (observing that Ohio had not made substantial changes to its lethal injection protocol).

25.    Tennessee not only made substantial changes to its protocol, it completely revoked that protocol and started over to determine a new method of lethal injection.

26.    On February 1, 2007, Tennessee's Governor Phil Bredesen issued an Executive Order which (a) <u>revoked</u> current [execution] protocols and any related procedures [including the

{7}

protocol under which Mr. West had been presented with, and signed whether written or otherwise]; (b) instructed the Commissioner of Correction to complete a comprehensive review of the manner in which death sentences are administered in Tennessee; (c) directed the Commissioner to issue new protocols and related procedures by May 2, 2007; and, d) stayed the executions of Michael Joe Boyd a/k/a/ Mika'eel Abdullah Abdus-Samad, Edward Jerome Harbison, Daryl Keith Holton[3] and Pervis T. Payne. (Attachment G, Executive Order).

27.     For a period of two months, Tennessee had no method for carrying out sentences of death.

28.     On April 30, 2007, pursuant to the Executive Order, the Tennessee Department of Corrections issued new execution protocols for both lethal injection and electrocution. Attachment B, Current Protocol.

29.     The Commissioner also released a Report on Administration of Death Sentences in Tennessee (Attachment A, Report). The Report declares that Tennessee "has retained a three-chemical protocol." (Attachment A, Report p.6).

30.     On July 15, 2010, the Tennessee Supreme Court set November 9, 2010, as the date for Mr. West's proposed execution.

31.     On both the date on which the State of Tennessee arrived at its new method of carrying out lethal injections and the date upon which the Tennessee Supreme Court set Mr. West's current execution date, and, in fact, from February 18, 2001, through October 20, 2010, Defendants had no intention to conduct, took no steps toward conducting, and did not take any of the wrongful acts alleged herein against Mr. West. During that entire period of time, Defendants

---

[3]Mr. Holton was scheduled for execution by electrocution.

{8}

were proceeding toward executing Mr. West by means of electrocution (Attachment J, Defendants' Response to Motion for Temporary Injunction, *State v. Ray, et al.*, Case No. 10-1675-I, Chancery Court for Davidson County, Tennessee (filed October 20, 2010), p.2 ("The defendants maintain that the February 13, 2001 Election Affidavit [choosing electrocution as a means of execution] is valid and still effective.").

32. Those actions alleged herein which occurred within that period of time, including those acts alleged relative to the revocation of all existing protocols and related procedures and the creation of a completely new protocol in 2007, did not become wrongful as to Mr. West until Defendants sought to apply those acts to him on October 20, 2010. *Id.*

33. Because both October 20, 2010 (the first date following the creation of Tennessee's execution protocol that Defendants proceeded to execute Mr. West by means of lethal injection), and March 10, 2010 (the date upon which Defendants had reason to know that their lethal injection protocol suffocated conscious and paralyzed inmates and, accordingly, inflicted unnecessary pain and suffering, an element of an Eighth Amendment violation) occurred within Tennessee's one-year statute of limitations, Mr. West's claims have been timely filed.

## PARTIES

34. Plaintiff Stephen Michael West is a United States citizen. He is a death-sentenced prisoner residing in this county at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee and in the custody of the Tennessee Department of Corrections.

35. Defendant Gayle Ray is the Commissioner of the Tennessee Department of Corrections. Plaintiff sues Commissioner Ray in her official capacity. Defendant Ray (who was

{9}

Deputy Commissioner of TDOC at the time) worked on the comprehensive review of the manner in which death sentences are administered in Tennessee. (Attachment A, Report p.4). Defendant Ray was a member of the Committee which created the Current Protocol (hereinafter "the Committee"). Defendant Ray will oversee the administration of Mr. West's execution. (Attachment B, Current Protocol p.26). Defendant Ray is a state actor acting under color of state law, and her actions in helping to devise the Protocol and seeking to execute or executing Mr. West under the Protocol as described *infra* violate his constitutional rights, as described *infra*.

36.     Defendant Ricky Bell is the Warden of Riverbend Maximum Security Institution, located in Nashville, Tennessee, in this county and where Plaintiff's execution will occur. Plaintiff sues Warden Bell in his official capacity. Defendant Bell was a member of and participated in the Committee's actions which created the Current Protocol to execute Mr. West. (Attachment A, Report p.4). Defendant Bell is directly in charge of executing Plaintiff at Riverbend. His role in Mr. West's execution is described in the Current Protocol (*e.g.*, Attachment B, Current Protocol p.12-13, 32-33, 36, 43, 50, 63-65, 67). Defendant Bell is a state actor acting under color of state law, and his actions in seeking to execute or executing Mr. West under the Current Protocol as described *infra* violate his constitutional rights, as described *infra*.

37.     Defendant David Mills is the Deputy Commissioner of TDOC. Plaintiff sues Deputy Commissioner Mills in his official capacity. Defendant Mills is a state actor acting under color of state law (Attachment A, Report p.4). Defendant Mills will work directly with Defendant Ray in overseeing Mr. West's execution and perform any assigned duties. (Attachment B, Current Protocol p.27). Defendant Mills' actions in seeking to execute or executing Mr. West under the Current Protocol as described *infra* violate his constitutional

{10}

rights, as described *infra*.

38.     Defendant Reuben Hodge is the Assistant Commissioner of Operations. Plaintiff sues Assistant Commissioner Hodge in his official capacity. Defendant Hodge is a state actor acting under color of state law. (Attachment A, Report p.4). Defendant Hodge will participate in Mr. West's execution, as described in the Current Protocol. (Attachment B, Current Protocol p.28, 66). Defendant Hodge's actions in seeking to execute or executing Mr. West under the Current Protocol as described *infra* violate his constitutional rights, as described *infra*.

39.     Defendants John Doe Physicians 1-100 are any and all medical doctors involved in the prescription, procurement and/or administration of sodium thiopental, pancuronium bromide, and/or potassium chloride for use upon Mr. West without the purpose to heal and without a legitimate medical reason, but to cause Mr. West's death. Procurement and dispensing of the lethal injection chemicals are described in the Current Protocol. (Attachment B, Current Protocol p.36). Upon information and belief, the lethal injection chemicals must be prescribed by Defendants John Doe Physicians 1-100 and must be prescribed by a practitioner for a legitimate medical purpose acting in the usual course of his profession and possessing a registration under the Controlled Substances Act. Defendant John Doe Physician 1 consulted with the Committee, will be present at Mr. West's execution and will perform a cut-down procedure, if necessary. (Attachment A, Report p.5). Defendant John Doe Physician 1 has unlimited discretion to use "a different method to find an IV site." (Attachment B, Current Protocol p.67). Defendant John Doe Physician 1 will participate in Mr. West's execution as described in the Current Protocol. (Attachment B, Current Protocol p.20, 63, 65, 67). Defendants John Doe Physicians 1-100 are state actors acting under color of state law, and their actions in

{11}

seeking to execute or executing Mr. West under the Current Protocol as described *infra* violate federal law and Mr. West's constitutional rights, as described *infra*.

40.     Defendants John Doe Pharmacists 1-100 are any and all persons involved in procuring, prescribing, dispensing, and/or administering sodium thiopental, pancuronium bromide, and/or potassium chloride for use upon Mr. West without the purpose to heal and without a legitimate medical reason, but to cause Mr. West's death. Procurement and dispensing of the lethal injection chemicals is described in the Current Protocol. (Attachment B, Current Protocol p.36). Upon information and belief, the procurement, dispensing and administration of the lethal injection chemicals must be pursuant to the prescription of a practitioner issued for a legitimate medical purpose in the usual course of his profession and possessing a registration under the Controlled Substances Act. Such Defendants are state actors acting under color of state law, and their actions in seeking to execute or executing Mr. West under the Current Protocol as described *infra* violate federal law and Mr. West's constitutional rights, as described *infra*.

41.     Defendants John Doe Medical Personnel 1-100 are any and all persons involved in using, preparing, or otherwise handling Plaintiff or sodium thiopental, pancuronium bromide, and/or potassium chloride in any attempt to administer sodium thiopental, pancuronium bromide, and/or potassium chloride upon Plaintiff without the purpose to heal and without a legitimate medical reason, but to cause Plaintiff's death. Such Defendants may include EMT-Paramedic 1 and EMT-Paramedic 2 who will participate in Mr. West's execution as described in the Current Protocol. (Attachment B, Current Protocol p.32, 40-44, 62-67), Execution Team Members as described in the Current Protocol (Attachment B, Current Protocol p.38-39, 50-51, 62-67), and

{12}

IV Team Members and Executioner as described in the Current Protocol (Attachment B, Current Protocol p.21, 41-44, 50-51, 62-67). Such Defendants are state actors acting under color of state law, and their actions in seeking to execute or executing Mr. West under the Current Protocol as described *infra* violate Mr. West's constitutional rights, as described *infra*.

42. Defendants John Doe Executioners 1-100 are any and all persons involved in using, preparing, or otherwise handling Plaintiff or sodium thiopental, pancuronium bromide, and/or potassium chloride in any attempt to administer sodium thiopental, pancuronium bromide, and/or potassium chloride upon Plaintiff without the purpose to heal and without a legitimate medical reason, but to cause Plaintiff's death. Such Defendants may include EMT-Paramedic 1 and EMT-Paramedic 2 who will participate in Mr. West's execution as described in the Current Protocol (Attachment B, Current Protocol p.32, 40-44, 62-67), the Deputy Warden as described in the Current Protocol (Attachment B, Current Protocol p.14), Execution Team Members as described in the Current Protocol (Attachment B, Current Protocol p.36-44, 50-51, 62-67), and IV Team Members and Executioner as described in the Current Protocol (Attachment B, Current Protocol p.21, 36-44, 50-51, 62-67). Such Defendants are state actors acting under color of state law, and their actions in seeking to execute or executing Mr. West under the Current Protocol as described *infra* violate Mr. West's constitutional rights, as described *infra*.

43. Defendants John Does 1-100 are any and all other persons who are, or would be, involved in the prescription, procurement, dispensing and/or administration of sodium thiopental, pancuronium bromide, and/or potassium chloride for use upon Plaintiff or otherwise handling Plaintiff without the purpose to heal and without a legitimate medical reason, but to cause Plaintiff's death; or otherwise involved in the actual execution of Plaintiff through the use of

{13}

sodium thiopental, pancuronium bromide, and/or potassium chloride. Such Defendants may include the Procurement Officer at Riverbend Maximum Security Institution (hereinafter "RMSI"), the Procurement Officer at DeBerry Special Needs Facility (hereinafter "DSNF") (Attachment B, Current Protocol p.36), the Warden's "designee," (Attachment B, Current Protocol p.36-37), the Execution Team Member designated for storing and inventorying the lethal injection chemicals, individuals in the Execution Chamber, the Deputy Warden as described in the Current Protocol (Attachment B, Current Protocol p.14), the Lethal Injection Recorder as described in the Current Protocol. (Attachment B, Current Protocol p.15, 63, 65), Execution Team Members responsible for mixing, set-up and administering of the lethal injection chemicals, other Execution Team Members, IV Team Members, the Executioner, and Defendant Bell, as described in the Current Protocol (Attachment B, Current Protocol p.36-44, 50-51, 62-67). Such Defendants may also include those whose actions will violate 21 U.S.C. §§ 822, 829 and 21 C.F.R. 21211301.11. Such Defendants may also include those who fail to enforce 21 U.S.C. §§ 822, 829 and 21 C.F.R. 21211301.11. Such Defendants are state actors acting under color of state law, and their actions in seeking to execute or executing Mr. West under the Current Protocol and their actions violating federal law as described *infra* violate Mr. West's constitutional rights, as described *infra*.

## I.     PRELIMINARY STATEMENT OF FACTS

44.     The State of Tennessee, through Defendants, seeks to execute Mr. West on November 9, 2010, by lethal injection using the Current Protocol described *infra*. The default method of execution prescribed by Tennessee law is lethal injection. TENN. CODE ANN. § 40-23-114.

{14}

## A.  DEFENDANTS' EXECUTION PROTOCOLS[4]

45.    Tennessee's current Protocol, "Tennessee's Execution Procedures for Lethal Injection," dated April 30, 2007, (Attachment B, Current Protocol) contains the lethal injection protocol to be used for Mr. West's execution. It replaced the protocol in effect prior to April 30, 2007, which was unilaterally revoked by Governor Bredesen.

46.    Tennessee's three-drug protocol consists of using sequential bolus injections of sodium thiopental, pancuronium bromide and potassium chloride. The stated explanation for the use of sodium thiopental is that "[i]t works by depressing the central nervous system, causing sedation or sleep, depending on the dose."[5] (*Id.* p.35). The stated explanation for the use of pancuronium bromide is that "[i]t will assist in the suppression of breathing and ensure death." (*Id.*). The stated explanation for the use of potassium chloride is that "[a] high dose of potassium chloride administered intravenously causes cardiac arrest and rapid death." (*Id.*).

### i.    Participants

47.    Under the Current Protocol, an execution by lethal injection requires the participation of the Commissioner (Defendant Ray), the Deputy Commissioner (Defendant Mills), Assistant Commissioner of Operations (Defendant Hodge), the Warden (Defendant Bell), the Deputy Warden (Defendant John Doe Executioner and/or Defendant John Doe), the Lethal Injection Recorder (Defendant John Doe), the Death Watch Supervisor, a Chaplain, MIS Security

---

[4]When "he" is used as a pronoun in place of the name of an as yet to be determined Defendant, it is gender neutral and may refer to either a male or female defendant.

[5]Sedation is defined as, "the calming of mental excitement or abatement of psychological function, especially by the administration of a drug." Random House Webster's Unabridged Dictionary, New York 1998.

{15}

Systems Technicians, a Physician and associate (Defendants John Doe Physician 1 and 2-100), an Extraction Team, an IV Team (Defendants John Does Medical Personnel and/or Defendants John Does Executioner and/or Defendants John Does), an Executioner (Defendant John Doe Executioner), an Execution Team (Defendants John Does Medical Personnel and/or Defendants John Does Executioner and/or Defendants John Does) (Attachment B, Current Protocol p.2, 63).

### ii.    Execution Procedures

48.    The Current Protocol is silent as to whether the inmate is provided medication before the execution and fails to caution about potential contraindications or reduced effectiveness of the sodium thiopental if such medication is given.

49.    The Current Protocol prescribes the sequence of events surrounding an execution as follows: On day one, the condemned inmate is moved to Death Watch and designated personnel check execution-related equipment (closed-circuit TV, telephones, intercom, etc.); on day two, the condemned inmate chooses his last meal, and on day three, the lethal injection chemicals are delivered to the Lethal Injection Room. (Attachment B, Current Protocol p.60-62).

50.    According to the Current Protocol, on day four, the Warden or Deputy Warden directs the Extraction Team to remove the inmate from the holding cell, place him on the gurney and secure him in restraints. The inmate is then moved to the Execution Chamber. The IV Team establishes IV lines into both arms. (Attachment B, Current Protocol p.64). The Warden gives the signal to proceed and the Executioner begins to administer the first chemical. Following the completion of the lethal injection process, and a five-minute waiting period, the Warden asks the Physician to enter the room to conduct an examination. The Physician reports his findings to the Warden or his designee. (Attachment B, Current Protocol p.65).

{16}

51.     The Current Protocol directs the Execution Team to bring the Lethal Injection Chemicals to the Lethal Injection Room three hours before an execution.  Each chemical is prepared for being drawn into syringes.  Two sets of eleven syringes are made.  (Attachment B, Current Protocol p.38).

52.     Under the Current Protocol, the drugs to be used are:

| | | |
|---|---|---|
| a. | Syringes 1-4 | Sodium Thiopental (5 grams: 5000 mg diluted by 200 cc sterile water) |
| b. | Syringe 5 | Saline (50 cc) |
| c. | Syringes 6 & 7 | Pancuronium Bromide (50 cc each of 100 mg/mL) |
| d. | Syringe 8 | Saline (50 cc) |
| e. | Syringes 9 & 10 | Potassium Chloride (50 cc each of 100 mg/mL of 2 mEq/mL) |
| f. | Syringe 11 | Saline (50 cc) |

(Attachment B, Current Protocol p.38-39).

53.     Under the Current Protocol, the drugs are administered in eleven syringes.  No time frame is given regarding administration of the drugs.  (Attachment B, Current Protocol p.43).

54.     Under the Current Protocol, ten boxes of 500 mg sodium thiopental are used to make 5 grams.  A member of the Execution Team injects 20 cc of sterile water into the powder.  The powder is dissolved into the water.  He repeats the process nine more times, using the remaining nine boxes.  He then draws the solution into four syringes.  (Attachment B, Current Protocol p.38).

55.     Under the Current Protocol, the Execution Team Member draws 50 cc of saline

{17}

solution into a syringe. Then, the Execution Team Member draws 50 cc of pancuronium

bromide (100 mg/mL) in each of two syringes. Next, he draws 50 cc of saline solution into a

syringe. Then, he draws 50 cc of potassium chloride (100 mL of 2 mEq/mL) into each of two

syringes. Next, he draws 50 cc of saline solution into a syringe. The labeled, numbered and

color coded syringes are on a tray on the workstation in the Lethal Injection Room. This process

is repeated for the second set of eleven syringes. (Attachment B, Current Protocol p.38-39).

    56.     Under the Current Protocol, two IV lines are prepared for simultaneous use. First,

the prisoner's arms are securely restrained to the gurney. A tourniquet is placed around the limb

or body part above the vein to be used. The Current Protocol does not instruct or designate a

person to remove the tourniquet. The IV Team inserts a catheter into the right arm, in the

antecubital fossa area, and attaches a Solution Set line from a sodium chloride bag (located in the

lethal injection room) to the catheter. (Attachment B, Current Protocol p.41-42).

    57.     The Current Protocol contains other locations for insertion of the catheter if it

cannot be inserted into a vein in the antecubital fossa area. The order of the locations is: forearm,

wrist, back of the hand, top of the foot, ankle, lower leg, or other locations as determined by the

EMT's. (Attachment B, Current Protocol p.41).

    58.     The Current Protocol directs that if "none of these veins are usable, the physician

is called into the Execution Chamber to perform a cut-down procedure." (Attachment B, Current

Protocol p.41). Prior to this, the Physician waits in the capital punishment garage. (Attachment

B, Current Protocol p.20). The Current Protocol alleges that a cut-down is "an ultimate and last

option." (Attachment B, Current Protocol p.20) but also allows the Physician to "choose[] a

different method to find an IV site." (Attachment B, Current Protocol p.67). The Current

{18}

Protocol is silent as to the Physician's qualifications, training and experience to perform such functions.

59.     The Current Protocol does not recommend the shortest possible length for the IV setup. Instead, it indicates that the Solution Sets are 85 inches long but may be purchased longer or shorter; extensions into the first port should be 18 to 24 inches in length; extensions are added to each end of the Solution Set until it reaches the desired length; the ends should reach from head to toe of the condemned inmate. (Attachment B, Current Protocol p.40).

60.     Under the Current Protocol, the IV line is connected to the catheter *via* extensions "added to each end until it reaches the desired length." (Attachment B, Current Protocol p.40). "The line is taped to the port (where the syringe is inserted) in place. The remainder of the line is placed out of the ports in the window" of the Lethal Injection Room and taped in place. (Attachment B, Current Protocol p.40). Tegaderm transparent dressing is placed over the catheter and the line is taped in place. (Attachment B, Current Protocol p.42).

61.     Under the Current Protocol, the process is repeated for the left arm. (Attachment B, Current Protocol p.41-42). Then the inmate's hands are taped in place, palms up, and the IV Team Members leave the Execution Chamber. (Attachment B, Current Protocol p.43).

62.     Under the Current Protocol, the Warden is the only person in the Execution Chamber with the condemned prisoner.

63.     Under the Current Protocol, the Warden gives the signal to proceed with the execution. The Executioner chooses the right or left IV line. The Executioner inserts and twists each syringe into the extension line, until all eleven syringes are injected. (Attachment B, Current Protocol p.43-44). The Current Protocol does not provide for a test of the inmate's level

{19}

of consciousness after the sodium thiopental is injected.

64.     The Current Protocol includes a diagram of the "Capital Punishment Unit." (Attachment B, Current Protocol p.9). The diagram shows the Lethal Injection Executioner's Room is separate from the Execution Chamber. *Id.* The window is not as wide as the length of the gurney. *Id.* It appears that the window does not have a direct view of the head and face of the condemned inmate. *Id.* The Current Protocol does not describe the lighting in the Executioner's Room.

65.     Under the Current Protocol, after a five minute waiting period, the Warden summons the Physician to determine if the prisoner is dead. (Attachment B, Current Protocol p.65). If not, the process is repeated. (Attachment B, Current Protocol p.67).

66.     The Current Protocol lacks medically necessary safeguards, thus increasing the risk that Mr. West will suffer unnecessary pain and prolonged death during the lethal injection process.

67.     The Current Protocol does not provide for qualified personnel and the persons involved in the process lack the qualifications, training and skills necessary to perform the procedure.

68.     Under the Current Protocol, the persons involved: the Executioner, the Execution Team Members, and the IV Team Members are not trained to use the three drugs in the manner required by the Current Protocol because any training is conducted with Saline. (Attachment B, Current Protocol p.33).

69.     The Current Protocol contains no adequate instructions for mixing the sodium thiopental or drawing the drugs into the syringes and administering the drugs to the condemned.

{20}

70.     Under the Current Protocol, no one except Defendant Bell is present in the Execution Chamber during the administration of the three chemicals. No one is at bedside monitoring the IV lines, the IV drip or the prisoner's vital signs or level of consciousness.

71.     Under the Current Protocol, there is no procedure for ensuring that the anesthetic agent is properly flowing into the prisoner, nor any procedures for ensuring that the prisoner is properly sedated prior to the administration of the second and third chemicals (as would be required in any medical or veterinary procedure before the administration of a neuromuscular blocking agent, such as pancuronium bromide, or the administration of a painful, burning potassium chloride overdose).

## B.     DEMONSTRATED RISKS OF UNNECESSARY PAIN AND SUFFERING

72.     Recent evidence from Tennessee, as well as documented evidence concerning lethal injection procedures in other states, shows that the Current Protocol demonstrates a history of multiple risks of unnecessary and severe pain along with lingering death during Mr. West's execution.

### i.     A History of Unnecessary Pain and Suffering Occurring in States Utilizing Lethal Injection Protocols.

73.     Those Defendants involved in the creation of the Current Protocol knew about the substantial risks involved in execution by lethal injection but disregarded those risks and failed to make changes and incorporate safeguards into the Current Protocol. In developing the Current Protocol, Defendants consulted "corrections professionals," "legal experts," and "court opinions in execution protocol cases" from other jurisdictions such as Missouri, Oklahoma, and Virginia. (Attachment A, Report p.1, 4-5, 12). Defendants referenced Florida's protocol and a law journal

{21}

article which describes problems with current protocols around the country and thirty-one botched executions. (Attachment A, Report p.13).

74. Executions in other states with lethal injection protocols which sometimes afford greater protections than the Current Protocols, have resulted in the unnecessary infliction of pain and suffering, even in jurisdictions where the executioners were far more experienced and/or skilled than those described in the Current Protocols:

a. Charles Brooks, Jr., December 7, 1982, **Texas**: In what was the first execution by lethal injection, an overdose of sodium thiopental took seven minutes to kill Brooks. Witnesses stated that Brooks "had not died easily."

b. James D. Autry, March 14, 1984, **Texas**: Autry took ten minutes to die, complaining of pain throughout. Officials suggested that faulty equipment or inexperienced personnel were to blame.

c. Thomas Andy Barefoot, October 30, 1984, **Texas**: A witness stated that after emitting a "terrible gasp," Barefoot's heart was still beating after the prison medical examiner had declared him dead.

d. Stephen Peter Morin, March 13, 1985, **Texas**: It took technicians over forty minutes to locate a suitable vein to insert the lethal injection needle, and another eleven minutes for Morin to die.

e. Randy Woolls, August 20, 1986, **Texas**: Because of his history of drug addiction, Woolls had to assist execution technicians in finding an adequate vein for insertion.

f. Elliot Rod Johnson, June 24, 1987, **Texas**: Johnson's execution was plagued by repetitive needle punctures and took executioners approximately thirty-five minutes to find a

{22}

vein.

g.     Raymond Landry, December 13, 1988, **Texas**: Two minutes into the execution, after a lengthy search for an adequate vein, the syringe came out of Landry's vein, "spewing deadly chemicals toward startled witnesses."

h.     Stephen McCoy, May 24, 1989, **Texas**: In a violent reaction to the drugs, which experts attributed to a weak dosage, McCoy "choked and heaved" during his execution.

i.     George "Tiny" Mercer, January 6, 1990, **Missouri**: A medical doctor was required to perform a cutdown on Mercer's groin. The Tennessee Committee purported to review lethal injection litigation in Missouri (Attachment A, Report p.12), but the Report fails to indicate what, if any guidance it obtained and why it rejected safer, less painful alternatives to a cut-down.

j.     Ronald Gene Simmons, June 25, 1990, **Arkansas**[6]: The administration of the lethal chemicals began at 9:02 p.m. Between 9:02 and 9:04 p.m., according to an eyewitness, Mr. Simmons appeared to nod off into unconsciousness. However, "at 9:05 p.m. he called out 'Oh! Oh!' and began to cough sporadically as though he might be having difficulty breathing. During the next two minutes, he coughed slightly, approximately 20 times, each cough heaving his stomach slightly and causing the gurney to shake a little." *See* Bill Simmons, *Stoic Murderer Meets His Fate By Quiet Means*, Arkansas Democrat Gazette, June 26, 1990 at 9A, Attachment

---

[6] The Arkansas lethal injection protocol calls for a 2 gram dose of sodium thiopental, followed by pancuronium bromide and potassium chloride. Using this protocol, the Department of Corrections there has presided over several executions where "inmates remained conscious and suffered pain during their executions." *See Nooner v. Norris*, No. 06-00110 (E.D. Ark.), June 26, 2006 Order (granting a preliminary injunction), p.4, Attachment L. The United States District Court for the Eastern District of Arkansas, stayed executions to allow further investigation into the constitutionality of the lethal injection protocol. *See Nooner, et al. v. Norris*, No. 06-00110 (E.D. Ark.).

{23}

K. Mr. Simmons became still at 9:07 p.m. after which his face and arm turned first blue and then purple. An ADC employee twice appeared to adjust the IV tube in Mr. Simmons' arm, and not until 9:19 p.m. was Mr. Simmons pronounced dead by the coroner. *Id.*

k.    George Gilmore, August 31, 1990, **Missouri**: According to a witnessing doctor, force was used to stick the needle into Gilmore's arm.

l.    Charles Troy Coleman, September 10, 1990, **Oklahoma**: Technicians had difficulty finding a vein and the execution was delayed by ten minutes. The Tennessee Committee purported to review lethal injection litigation in Oklahoma (Attachment A, Report p.12) but the Report does not indicate what, if any guidance, was obtained and why the Current Protocol does not provide a pre-execution examination of the prisoner to ameliorate problems associated with locating adequate veins which results in a painful and prolonged execution.

m.    Charles Walker, September 12, 1990, **Illinois**: There was some indication that, while appearing calm on the outside due to the paralyzing drugs, Walker suffered excruciating pain. There were reports of faulty equipment and inexperienced personnel.

n.    Maurice Byrd, August 23, 1991, **Missouri**: The machine used to inject the lethal dosage malfunctioned. The Tennessee Committee purported to review lethal injection litigation in Missouri (Attachment A, Report p.12), but the Report fails to indicate what, if any guidance it obtained and why the Current Protocol fails to anticipate and provide contingencies for malfunctioning equipment.

o.    Ricky Ray Rector, January 24, 1992, **Arkansas**: The execution took 1 hour and 9 minutes. Mr. Rector's hands and arms were punctured no less than 10 separate times searching for a suitable vein. Ultimately, someone on the execution team did a cut-down into his arm.

{24}

Witnesses could hear his moans as they looked for a vein. *See* Sonja Clinesmith, *Moans Pierced Silence During Wait*, Arkansas Democrat Gazette, January 26, 1992, at 1B, Attachment M; Ron Fournier, 13 *Outsiders View Death Of Rector, Witnesses Listen, Wait Beyond Curtain*, Arkansas Democrat Gazette, January 26, 1992, at 4B, Attachment N. Rector talked after 2 minutes and then after 5 minutes his lips were still moving rapidly - as if he was trying to draw shallow breaths. He was not pronounced dead until 10:09 p.m. *See* Joe Farmer, *Rector, 40, Executed for Officer's Slaying*, Arkansas Democrat Gazette, January 25, 1992, at 9A, Attachment O; Fournier, Attachment N.

  p. Robyn Lee Parks, March 10, 1992, **Oklahoma**: Parks had a violent reaction to the drugs used in his execution. Two minutes after the drugs were dispensed the muscles in his jaw, neck, and abdomen began to react spasmodically for approximately 45 seconds. Parks continued to gasp and violently gag until death came, eleven minutes after the drugs were first administered. A Tulsa World reporter wrote that the execution looked "painful and ugly," and "scary." One witness said that his death looked "painful and inhumane." The Tennessee Committee purported to review lethal injection litigation in Oklahoma. (Attachment A, Report p.12), but the Report fails to indicate what, if any guidance it obtained and why the Current Protocol does not anticipate a violent reaction to the three drugs and provide procedures to avoid such a reaction.

  q. Billy Wayne White, April 23, 1992, **Texas**: White's death required forty-seven minutes because executioners had difficulty finding a vein that was not severely damaged from years of heroin abuse.

  r. Justin Lee May, May 7, 1992, **Texas**: According to a witness, May gasped and

Case 3:10-cv-01016 Document 1 Filed 10/28/10 Page 29 of 117 PageID #: 29

reared against his restraints during his nine-minute death.

s.  Steven Douglas Hill, May 7, 1992, **Arkansas**: His execution began at 9:02 p.m. His eyes closed one minute later, but shortly afterwards he had what witnesses described as "a 'seizure' arching his back with his cheeks popping." *See* Andy Gotlieb and Linda Satter, *Hill Dies By Injection for '84 Police Killing*, Arkansas Democrat Gazette, May 8, 1992, at 17A, Attachment P. He was visibly gasping for air, and even though he was strapped down to the gurney, his chest was heaving against the wide belt that covered his chest. The seizure ended at 9:04 p.m. and Mr. Hill was pronounced dead at 9:10 p.m.

t.  John Wayne Gacy, May 10, 1994, **Illinois**: Complications caused by a faulty delivery tube resulted in Gacy's execution lasting eighteen minutes.

u.  Emmitt Foster, May 3, 1995, **Missouri**: Foster took twenty-nine minutes to die. Seven minutes after the lethal chemicals began to flow into Emmitt Foster's arm, the execution was halted when the chemicals stopped circulating. With Foster gasping and convulsing, the blinds were drawn so that witnesses could not view the scene. According to the Washington County Coroner who pronounced death, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney; they were so tight that the flow of chemicals into the veins was restricted. Foster did not die until several minutes after a prison worker finally loosened the straps.

v.  Ronald Allridge, June 8, 1995, **Texas**: Allridge's execution was conducted with only one needle, rather than the standard two, because a suitable vein could not be found in his left arm.

w.  Richard Townes, Jr., January 23, 1996, **Virginia**: It took twenty-two minutes for

{26}

medical personnel to find an adequate vein. After unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes' right foot. The Tennessee Committee purported to review lethal injection litigation in Virginia (Attachment A, Report p.12), but the Report fails to indicate what, if any, guidance it obtained and why the Current Protocol does not provide for a pre-execution examination of the prisoner to ameliorate problems associated with locating adequate veins which results in a painful prolonged execution.

      x.     William Bonin, February 23, 1996, **California**: The execution logs of William Bonin's execution also reflect irregularities that may have caused Bonin to die in excruciating pain. Mr. Bonin was given a second dose of pancuronium bromide for reasons that remain unclear, even though a properly administered initial dose would paralyze an inmate for several hours. *See* Execution Log of William Bonin, Attachment Q.

      y.     Tommie J. Smith, July 18, 1996, **Indiana**: The execution team required a total of thirty-six minutes to find a vein. Officials acknowledged that they had known beforehand that Smith's unusually small veins might cause problems.

      z.     Luis M. Mata, August 22, 1996, **Arizona**: Mata remained strapped to a gurney with the needle in his arm for one hour and ten minutes while his attorneys argued his case. When injected, his head jerked, his face contorted, and his chest and stomach sharply heaved.

      aa.     Scott Dawn Carpenter, May 8, 1997, **Oklahoma**: Carpenter gasped and shook for three minutes following the injection. He was pronounced dead eight minutes later. The Tennessee Committee purported to review lethal injection litigation in Oklahoma (Attachment A, Report p.12), but the Report fails to indicate what, if any, guidance it obtained and why the Current Protocol does not include provisions designed to ameliorate a prolonged execution.

{27}

bb.     Michael Eugene Elkins, June 13, 1997, **South Carolina**: Liver and spleen problems had caused Elkins's body to swell, requiring executioners to search almost an hour--and seek assistance from Elkins--to find a suitable vein.

cc.     Joseph Cannon, April 23, 1998, **Texas**: Cannon's vein collapsed and the needle popped out after the first injection. These events caused him to make a second final statement and be injected a second time behind a closed curtain.

dd.     Genaro Ruiz Camacho, August 26, 1998, **Texas**: Camacho's execution was delayed approximately two hours due to last-minute appeals and problems finding suitable veins in Camacho's arms, which had been damaged by his drug problem.

ee.     Roderick Abeyta, October 5, 1998, **Nevada**: The execution team took twenty-five minutes to find a vein suitable for the lethal injection.

ff.     Manuel Babbit, May 4, 1999, **California**: A minute after the pancuronium bromide was administered, Mr. Babbit had shallow respirations and brief spasms in his upper abdomen suggesting an attempt to fight against the effects of the pancuronium bromide. Execution Log of Manuel Babbit, Attachment R. Tennessee's Current Protocol does not differ in any material respect from that used in the California executions, including 5 grams of thiopental.

gg.     Bennie Demps, June 8, 2000, **Florida**: The execution team had to forfeit the second injection (Florida protocol demands two injections) after a thirty-three minute search failed to locate a suitable second vein. Demps complained of pain and bleeding in his final statement. The Tennessee Committee purported to review the lethal injection process in Florida (Attachment A, Report p.13), but the report fails to indicate what, if any, guidance it obtained and why the Current Protocol does not minimize the pain and suffering and prolonged death by

{28}

providing a physical of the condemned and identification of suitable veins before the execution process begins.

hh. Bert Leroy Hunter, June 28, 2000, **Missouri**: In a violent reaction to the drugs, Hunter repeatedly coughed and gasped for air after the lethal chemicals were injected and before he lapsed into unconsciousness. A witness reported that Hunter had "violent convulsions. His head and chest jerked rapidly upward as far as the gurney restraints would allow, and then he fell quickly down upon the gurney. His body convulsed back and forth ...repeatedly...He suffered a violent and agonizing death." The Tennessee Committee purported to review the lethal injection process in Missouri (Attachment A, Report p.12), but the Report fails to indicate what, if any, guidance it obtained and why the Current Protocol does not anticipate a violent reaction to the three drugs and provide procedures to avoid such a reaction.

ii. Willie Fisher, March 9, 2001, **North Carolina**[7]: During the lethal injection of Willie Fisher, "Mr. Fisher appeared to lose consciousness around 9:00 p.m. but subsequently began convulsing . . . he looked as though he was trying to catch his breath but could not and his

---

[7] In *Brown v. Beck*, No. 06-3018, the District Court of the Eastern District of North Carolina, Western Division, had before it toxicology data following four executions in North Carolina showing low post-mortem levels of sodium thiopental. North Carolina's protocol calls for a 3 gram dosage of the drug, to be followed by pancuronium bromide and potassium chloride. The toxicology data contradicted the opinion of the State's experts as to the expected concentration that would be present in a man of average size after having been given a dose of 3000 mg of sodium thiopental. *See Brown v. Beck*, 2006 U.S. Dist. LEXIS 60084 (E.D.N.C. April 7, 2006) (denying preliminary injunction, but conditioning future executions on presence of an anesthesiologist).

Also in *Brown*, the District Court had before it affidavits from attorneys present at recent executions who had witnessed the condemned inmates writhing, convulsing, and gagging when executed. Again, such witness accounts were inconsistent with a sufficient dose of sodium thiopental having been successfully delivered to the brain such that the condemned inmate would not feel pain.

{29}

eyes were open as his chest heaved repeatedly." He was not pronounced dead until 9:21 p.m. *See Brown*, supra at *17. The Tennessee Committee purported to review lethal injection litigation in North Carolina (Attachment A, Report p.12), but the Report fails to indicate what guidance, if any, it obtained and why the Current Protocol does not contain procedures to determine the condemned is unconscious before administration of the second and third drugs.

jj.      Joseph Martinez High, November 7, 2001, **Georgia**: For twenty minutes, prison technicians attempted unsuccessfully to locate a vein in High's arms. Eventually, they inserted a needle in High's chest, after a doctor cut an incision there, while they inserted the other needle in one of High's hands.

kk.·      Stephen Wayne Anderson, January 29, 2002, **California**: Witness accounts suggest that Mr. Anderson was not properly anesthetized when he died. The execution took over 30 minutes, and during that time Mr. Anderson's chest and stomach "heaved more than 30 times." *See* Declaration of Margo Rocconi, Attachment S, ¶6. The Tennessee Committee purported to review lethal injection litigation in California (Attachment A, Report p.12), but the Report fails to indicate what guidance, if any, it obtained and why the Current Protocol does not contain procedures to determine the condemned is unconscious before administration of the second and third drugs.

ll.      Eddie Hartman, October 3, 2003, **North Carolina**: During the lethal injection of Eddie Ernest Hartman, he appeared to suffer for at least five minutes after the lethal injection. "Eddie's throat began thrusting outward and collapsing inward. His neck pulsed, protruded, and shook repeatedly. Eddie's chest at first pulsated frequently, then intermittently, and at least twice I saw Eddie's chest heave violently ... . Throughout the execution, Eddie's eyes were partly open

{30}

while his body relentlessly convulsed and contorted." *See Brown, supra* at *16. The Tennessee Committee purported to review lethal injection litigation in North Carolina (Attachment A, Report p.12), but the Report fails to indicate what guidance, if any, it obtained and why the Current Protocol does not contain procedures to determine the condemned is unconscious before administration of the second and third drugs.

mm.    Timmy Keel, November 7, 2003, **North Carolina**: During the lethal injection of Timmy Keel, his body was "twitching and moving about for approximately ten minutes" after the injection of the chemical cocktail. *Id.*

nn.    John Daniels, November 14, 2003, **North Carolina**: During the lethal injection of John Daniels, Mr. Daniels convulsed violently after the administration of the chemical cocktail. "He sat up and gagged." Witnesses "could hear him through the glass." "A short time later, [Mr. Daniels] sat up and gagged and choked again, and struggled with his arms under the sheet. He appeared to [witnesses] to be in pain. He finally lay back down and was still." *Id.*

As the District Court there found, "evidence of the problems associated with these executions while, perhaps, not clearly indicative of the protocol, does raise some concerns about the effect of North Carolina's protocol." *See Brown, supra* at *18 (concluding "it would be inappropriate to allow Defendants to proceed with Mr. Brown's execution under the current protocol considering the substantial questions raised"). The Tennessee Committee purported to review lethal injection litigation in North Carolina (Attachment A, Report p.12), but the Report fails to indicate what guidance, if any, it obtained and why the Current Protocol does not contain procedures to determine the condemned is unconscious before administration of the second and third drugs.

{31}

oo.     Joseph Lewis Clark, May 2006, **Ohio**: Execution team members took over twenty minutes to insert one IV catheter into Mr. Clark's arm. According to Ohio protocol two catheters were necessary, but the team proceeded with only one. After the single IV was inserted and the chemicals began to flow, Mr. Clark remained breathing, legs moving, arms strapped down. After minutes, he raised up several times and told executioners, "It's not working, it's not working." Minutes later, Mr. Clark raised up again and said, "can't you just give me something by mouth to end this?" At that point, the team closed the curtain, and witnesses heard groans and moans from Mr. Clark as if he was in agony. Witnesses reported that the cries of pain lasted for about five or ten minutes and were followed by snores from Mr. Clark. Obviously, if the sodium thiopental had worked properly, Mr. Clark would not have been able to cry out in pain, feel pain, or sit up during the execution. *See* Adam Liptak, *Trouble Finding Inmate's Vein Slows Lethal Injection in Ohio*, New York Times, May 3, 2006, Attachment T. Defendants failed to indicate why they chose not to include a procedure in the Current Protocol to insure the condemned is adequately anesthetized before administration of the second and third drugs. At the time of Clark's execution, Ohio was using a lethal injection protocol that used three drugs. It has since adopted a one-drug protocol. *(New Execution Method is Used in Ohio*, New York Times, December 9, 2009, Attachment U). The botched execution of Mr. Clark demonstrates graphically and horrifically how an execution that appeared completely normal and routine at the outset can rapidly go horribly wrong. Ohio's previous protocol called for 2 grams of sodium thiopental, followed by pancuronium bromide and potassium chloride.

pp.     Angel Diaz, December 13, 2006, **Florida**: Using a three-drug protocol, Mr. Angel Diaz did not get an effective amount of sodium thiopental because the IV lines were

{32}

improperly seated in his veins with through and through punctures. As a result, none of the materials injected went to the right place. Instead, the drugs entered his bloodstream first through his flesh and muscle tissue. This process caused foot-long chemical burns on both arms from the sodium thiopental. During the execution, observers reported that Mr. Diaz moved and tried to mouth words. It took 34 minutes and 14 syringes of chemicals for Mr. Diaz to die, during which he was clearly in pain, struggling for breath and grimacing. *See* Attachment V, Chris Tisch, *Executed Man Takes 34 Minutes To Die*, www.Tampabay.com, December 13, 2006; Attachment W, Chris Tisch, *Second Dose Needed To Kill Inmate*, www.Tampabay.com, December 14, 2006; Attachment X, Florida Commission Report, p.8-9.

Following the Diaz execution, Governor Bush ordered that all executions be stayed while a committee undertook a review of the Diaz execution and of lethal injection protocols in Florida in general. (Executions remain stayed in Florida under that order. *See* Attachment X, Florida Commission Report p.2). The Tennessee Committee purported to review the Florida Commission Report (Attachment A, Report p.13), but failed to indicate what, if any, guidance it obtained and why any proposal in the Florida Report were rejected and not included in the Current Protocol.

75.    In each of the executions described in the preceding paragraphs, the infliction of unnecessary pain and suffering upon the condemned was the direct and proximate result of the inadequate training and/or qualifications of the persons participating in the execution, coupled with the lack of guidance provided by the respective execution protocols.

76.    The Current Protocol fails to require the use of persons more qualified than those used in the foregoing executions to carry out Mr. West's execution.

{33}

77.     The Current Protocol fails to require more training for the persons carrying out Mr. West's execution than the training required for the persons carrying out the foregoing executions.

78.     The Current Protocol fails to provide more guidance for the persons carrying out Mr. West's execution than the guidance provided to the persons carrying out the foregoing executions by the protocols guiding such executions.

79.     Each of the foregoing incidents of the needless infliction of pain and suffering occurred prior to the adoption of the Current Protocol and was therefore known to Defendants.

80.     The nature of the protocols guiding the foregoing executions was known to Defendants prior to the adoption of the Current Protocol. In developing the Current Protocol, Defendants consulted "corrections professionals," "legal experts," and "court opinions in execution protocol cases" from other jurisdictions such as Missouri, Oklahoma, and Virginia. (Attachment A, Report p.1, 4-5, 12). In addition, Defendants referenced Florida's protocol and a law journal article which describes problems with current protocols around the country and thirty-one botched executions. (Attachment A, Report p.13).

**ii.     Known risks in Tennessee's protocol and known failures of persons carrying out Tennessee's lethal injection protocols.**

81.     Defendants themselves have experienced problems with collapsed veins, or a blowout, and clogged IV lines during practice sessions with Saline. (*Harbison v. Little, et al*, No.3:06-cv-1206,(M.D.Tenn.) DE. 63-19, p.2 of 7, Bell Testimony). Such problems result in an insufficient level of anesthesia to prevent the condemned from experiencing the terror of suffocation from the pancuronium bromide and excruciating pain from the potassium chloride.

{34}

82.     The inability of those persons carrying out Mr. West's execution to properly

prepare and/or administer the lethal chemicals with only the amount of guidance and training

provided under the Current Protocol, even absent the pressures attendant in actually taking a

human life, was known to Defendants prior to the adoption of the Current Protocol.

83.     The fact that the failure to properly prepare and/or administer the lethal chemicals

will result in the infliction of unnecessary pain and suffering on Mr. West was known to

Defendants prior to the adoption of the Current Protocols.

   iii.     **Even if carried out according to the Protocol, Tennessee's lethal injection
            procedure inflicts unnecessary and wanton pain and suffering.**

84.     The State of Tennessee has been through a number of executions using methods

similar to those put forth in the current protocols.  Autopsies and eye-witness observations from

these executions show that the protocols create a demonstrated risk of severe pain.  Unlike the

evidence reviewed by the Supreme Court in *Baze v. Rees*, 553 U.S. 35, 108-10 (2008), where

some of the justices concluded that the controversy surrounding the methodology of the *Lancet*

study rendered it inadequate to justify judicial intervention in a state's administration of the

three-drug protocol, Mr. West is offering evidence of cruel and unusual punishment based on

information about Tennessee inmates obtained from autopsies that followed Tennessee's

executions.  The variables that may have undermined the findings of the *Lancet* article are simply

not present here.

{35}

## Coe Execution

85.     Robert Coe was executed by suffocation while inadequately anesthetized.  His

toxicology report indicated a serum sodium thiopental level of 10.2 mg/L. (Attachment Y, Coe

Autopsy Bates p.13).  Assuming that Dr. Levy, who conducted the autopsy, correctly recalled

that the blood sample was obtained from a peripheral location, *i.e.*, one of his femoral vessels,

there is no substantial question but that the toxicology report accurately reflects his serum

thiopental level at the time of death.

86.     Mr. Coe's autopsy report reveals that the intravenous catheters used for his

execution remained properly placed in accordance with the Tennessee Protocol in the superficial

blood vessels of the antecubital fossa of both of Mr. Coe's arms.  (Attachment Y, Coe Autopsy

Bates p.05).  Mr. Coe's autopsy did not describe any signs of infiltration at the injection site. *See*

*also* Dr. Levy testimony, *Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-01206, DE. 142,

TR725-26, DE. 143, TR903-04.

## Workman Execution

87.     Philip Workman was executed on May 9, 2007, under the current Tennessee

Protocol.  The autopsy report was completed on October 24, 2007.  (Attachment Z, Workman

Autopsy Bates p.01).

88.     Mr. Workman's post-mortem thiopental level was 18.9 mg/L, (Attachment Z,

Workman Autopsy Bates p.03, 07), which means he was not fully anesthetized during his

execution. (Attachment AA, 2007 Affidavit of Dr. Lubarsky p.5).

89.     Mr. Workman's autopsy was not performed, and blood was not drawn, until ten

days after his execution. (Attachment Z, Workman Autopsy Bates p.03).  The blood sample used

to determine Mr. Workman's level of thiopental was taken from his heart (*Id.* at p.7).

90.     Dr. Levy, who performed Mr. Workman's autopsy, testified that thiopental redistributes from the extremities back to the heart following death, making those levels higher than would be found at the time of death. (*Harbison v. Little, et al*, M.D.Tenn., No. 3:06-cv-1206, DE. 142, TR733-34; *see also* Attachment AA, 2007 Affidavit of Dr. Lubarsky p.5).

91.     Due to the time lapse and post-mortem distribution, there is an even greater probability that the level of thiopental in Mr. Workman at the time of his death was less than 18.9 mg/L found in the heart blood drawn ten days after his death. (Attachment AA, 2007 Affidavit of Dr. Lubarsky p.5-6).

92.     The post-mortem drug level of thiopental measured in Mr. Workman would not be sufficient to produce unconsciousness or anesthesia. This means that during the execution procedure, Mr. Workman was probably awake, suffocating in silence, and feeling the searing pain caused by the intravenous injection of potassium chloride. (*Id.* p.6).

93.     The reported level of pancuronium bromide in Mr. Workman's blood would be sufficient to cause full paralysis and death by suffocation. (*Id.*).

94.     Mr. Workman was executed by suffocation while inadequately anesthetized.

95.     Mr. Workman's autopsy report reveals that the intravenous catheters used for his execution remained properly placed in accordance with the Tennessee Protocol in the superficial blood vessels of the antecubital fossa of both of Mr. Workman's arms. (Attachment Z, Workman Autopsy Bates p.05). Mr. Workman's autopsy did not describe any signs of infiltration at the injection site. *See also* Dr. Levy testimony, *Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-1206, DE. 142, TR725-26, DE. 143, TR903-04.

{37}

**Henley Execution**

96.     Steve Henley was executed on February 4, 2009, under the current Tennessee Protocol. The autopsy report on Mr. Henley was finalized more than a year later on February 17, 2010, and released on March 10, 2010. (Attachment BB, Henley Autopsy Bates p.01, 07).

97.     Witnesses observed Mr. Henley turn blue to purple in color during the execution process. (Attachment CC, Affidavit of Stacy Rector & exhibits attached thereto).

98.     Mr. Henley's autopsy report reveals his sodium thiopental level was 8.31 mg/L; an amount inadequate to cause Mr. Henley to be unconscious during his execution. (Attachment BB, Henley Autopsy Bates p.02, 06, 09; Attachment AA, 2007 Affidavit of Dr. Lubarsky p.6).

99.     Mr. Henley's potassium level was not elevated and would have had no effect on his heart. (Attachment BB, Henley Autopsy Bates p.02, 06; Attachment AA, 2007 Affidavit of Dr. Lubarsky p.6-7). This is consistent with the observations of witnesses to Mr. Henley's execution that his face began to turn blue to purple approximately seven minutes after the execution because a change of color occurs when non-oxygenated blood is pumped to the extremities by a beating heart. (Attachment AA, 2007 Affidavit of Dr. Lubarsky p.7 ).

100.    Mr. Henley's pancuronium bromide level was far above the level required to cause Mr. Henley's death through suffocation. (Attachment BB, Henley Autopsy Bates p.02, 06; Attachment AA, 2007 Affidavit of Dr. Lubarsky p.7).

101.    Eyewitness accounts that Mr. Henley turned blue to purple during the execution are consistent with death by suffocation. (Attachment AA, 2007 Affidavit of Dr. Lubarsky p.7).

102.    Mr. Henley's death was caused by suffocation induced by pancuronium bromide at a time when he was not adequately anesthetized. (*Id.*).

{38}

103. Mr. Henley's autopsy report reveals that the intravenous catheters used for his execution remained properly placed in accordance with the Tennessee Protocol in the superficial blood vessels of the antecubital fossa of both of Mr. Henley's arms, (Attachment BB, Henley Autopsy Bates p.04), and that all drugs had been fully dispensed in accordance with the Tennessee Protocol (*Id.*). Mr. Henley's autopsy did not describe any signs of infiltration at the injection site.

104. Tennessee has conducted five executions by lethal injection. Of these, no autopsy was done on Sedley Alley or Cecil Johnson. The autopsies of other three, Coe, Workman and Henley, all show that person was executed in a cruel and inhumane way. All three died by suffocation while likely conscious. This shows that Tennessee's protocols, even if properly administered, "create a demonstrated risk of severe pain." *See Baze v. Rees*, 553 U.S. 35, 61 (2008).

### iv. Sodium thiopental, as used in the Tennessee Protocol, does not effectively establish unconsciousness.

105. Sodium thiopental is an ultra-short acting barbiturate wherein the induction of anesthesia occurs quickly, but its effect wears off in a matter of minutes.

106. Anesthesia is the process of blocking the perception of pain and other sensations, creating insensibility to pain.

107. There are differing levels of anesthesia, and thus consciousness.

108. The way the human body reacts to various stimuli differs depending upon the level of anesthesia. For example, when a person is administered sodium thiopental, a person will continue to have the following states of consciousness at the following serum levels of pentothal:

{39}

a. 0-13 mg/l: Consciousness
b. 13-18 mg/l: Loss of purposeful movement in response to verbal stimulation
c. 23-28 mg/l: Loss of purposeful movement in response to tetanic nerve stimulation
d. 33-46 mg/l: Loss of purposeful movement in response to trapezius muscle squeeze
e. 45-57 mg/l: Loss of movement in response to larangoscopy
f. 63 mg/l >: Loss of movement in response to intubation

*Thiopental Pharmacodynamics*, Attachment DD.

109.    Upon administration of sodium thiopental, EEG brain activity peaks at 13.3 mg/L, after which it drops back to normal activity at 31.2 mg/L, and zero brain waves per second occurs only with serum levels above 50 mg/L.

110.    The thiopental level for Mr. Coe was 10.2 mg/L; for Mr. Workman it was 18.9 mg/L; and for Mr. Henley it was 8.31. (Attachment Y, Coe Autopsy Bates p.13; Attachment Z, Workman Autopsy Bates p.03, 07; Attachment BB, Henley Autopsy Bates p.02, 09).

111.    Every autopsy performed following an execution under the Tennessee Protocol reveals levels of thiopental below those required to induce unconsciousness that would prevent serious harm from the administration of pancuronium bromide and potassium chloride. (Attachment EE, 2010 Affidavit of Dr. Lubarsky p.7-8).

112.    The use of sodium thiopental under the Tennessee Protocol will not sufficiently anesthetize Mr. West to prevent serious harm from the administration of pancuronium bromide and potassium chloride.

v.    **Pancuronium bromide (Pavulon), when administered as intended, is the fatal agent under the Tennessee Protocol.**

113.    Pancuronium bromide, marketed under the name Pavulon, is a neuromuscular blocking agent which causes paralysis of the skeletal muscles of an individual.  While

{40}

pancuronium bromide paralyzes the diaphragm to prevent breathing, it does not affect the heart muscle.

114. Pancuronium bromide does not affect the brain or nervous system, nor does it block the actual reception of nerve impulses in the brain or the passage of such impulses within the brain. Pancuronium bromide does not affect consciousness or the sensation of pain or suffering. An individual under the influence of pancuronium bromide, though paralyzed, still has the ability to think, to be oriented to where he is, to experience fear or terror, to feel pain, and to hear. (*See* Commissioner Little testimony, *Harbison v. Little, et al*, M.D.Tenn., No. 3:06-cv-01206, DE. 138, TR50; Levy testimony, DE. 142, TR718; Higgins testimony, DE. 143. TR953). *See also, Harbison*, 511 F.Supp.2d 872, 883-84 (2007).

115. A lethal level of pancuronium is 0.16 mg/L. (Attachment FF, Winek Drug & Chemical Blood-Level Data 2001 p.12). Pancuronium bromide, administered by itself as a "lethal dose" will ultimately cause someone to asphyxiate or suffocate to death while still conscious.

116. If an individual is not properly anesthetized when injected with pancuronium bromide, he will consciously experience extreme pain and terror while being completely paralyzed. In this state, the person will undergo the terrorizing and excruciating experience of suffocation without the ability to move or to express the pain and suffering which he is experiencing as he is being suffocated. *Harbison*, 511 F.Supp.2d at 883-84.

117. Because pancuronium bromide paralyzes all skeletal muscles including facial muscles and those used to speak or communicate through noises, an observer cannot detect, from outward appearance, any expression of pain, horror, or suffering experienced because of the use

{41}

of pancuronium bromide or suffering from any other source, such as potassium chloride which will activate the nerves of the venous system causing an extreme burning pain.

118.     The pancuronium bromide levels in Mr. Coe (4.7 mg/L), Mr. Workman (.630 mg/L), and Mr. Henley (1.6 mg/L), were sufficient to cause paralysis and death by suffocation. (Attachment Y, Coe Autopsy Bates p.14; Attachment Z, Workman Autopsy Bates p.03, 07; Attachment BB, Henley Autopsy Bates p.02; Attachment EE, 2010 Affidavit of Dr. Lubarsky p.4-5, 6, 7).

119.     The Tennessee Protocol, when administered as designed, will inject an amount of pancuronium bromide that will paralyze and suffocate Mr. West, causing his death.

**vi.     Potassium chloride, when administered as intended, by the Tennessee protocol does not induce cardiac arrest.**

120.     In the Tennessee Protocol, potassium chloride is the stated means for "cardiac arrest and rapid death." (Attachment B, Current Protocol p.35).

121.     The administration of potassium chloride activates all the nerve fibers inside the venous system.  Because veins are replete with nerve fibers, the administration of potassium chloride into the veins creates extreme pain.

122.     It takes a serum concentration of more than 16 mEq/L (16mmol/L) of potassium to arrest the heart. (Attachment GG, Affidavit of James Ramsey p.6-7 ¶¶XXV & XXVII; *See* Ramsey testimony, *Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-1206, DE. 139, TR262-64; TR272-78).

123.     The autopsy report of Robert Coe demonstrates that his vitreous potassium was 9 mEq/L (9 mmol/L), far short of the required minimum 16.4 mEq/L to cause electro mechanical

{42}

arrest of the heart. (Attachment GG, Affidavit of James Ramsey p.8 ¶XXX; *See* Ramsey testimony, *Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-1206, DE. 139, TR262-63). Dr. Higgins testified that a potassium level of nine milliequivalents might not be fatal and a person like Mr. Coe could survive. (*Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-1206, DE. 143, TR950-51). Dr. Levy testified that the only drug level in Mr. Coe's blood to completely reach a lethal level was the pancuronium bromide. (*Id.*, TR920).

124. The autopsy report of Philip Workman indicates his vitreous potassium level was 9 mEq/L (9 mmol/L). (Attachment Z, Workman Autopsy Bates p.12 ). This level is far short of the required minimum 16.4 mEq/L to cause electro mechanical arrest of the heart.

125. The autopsy report of Steve Henley demonstrates that his vitreous potassium was 6 mEq/L (6mmol/L). (Attachment BB, Henley Autopsy Bates p.19). The vitreous potassium level was normal, not elevated, and far short of the required minimum 16.4 mEq/L to cause electromechanical arrest of the heart. (Attachment GG, Ramsey Affidavit p.7¶XXVII; *See* Ramsey testimony, *Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-1206, DE. 139, TR262-64).

126. Witnesses to the Henley execution observed his skin color turn blue to purple during his execution. (Attachment CC, Affidavit of Stacy Rector & exhibits attached thereto).

127. Mr. Henley's change in skin color is consistent with death by suffocation while his heart continued to beat. (Attachment EE, 2010 Affidavit of Dr. Lubarsky p.7).

128. One of the main contributing factors to low potassium concentration solutions reaching the heart would be that, given an intravenous injection, the solution would necessarily have to pass through the lungs (which have the surface area of approximately that of a tennis court) during which the potassium concentrations would fall dramatically. (Attachment GG,

{43}

Ramsey Affidavit p.8 ¶XXX; *See* Ramsey testimony, *Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-1206, DE. 139, TR257-58).

129.     Using an amount of, and a method of administering, potassium chloride which does not arrest the heart is meaningless and arbitrary and without a legitimate or compelling purpose. It will not hasten or effect death. It will only inflict excruciating pain if the condemned is not properly anesthetized. Instead, the killing agent will be the pancuronium bromide meaning death by suffocation or asphyxiation.

130.     The Tennessee Protocol, when administered as designed, will inject an amount of potassium chloride that will not cause Mr. West's death but will cause excruciating pain.

C.     KNOWN RISK IN TENNESSEE'S THREE-DRUG PROTOCOL

i.     Defendants' Procurement Of Drugs For Use Upon Plaintiff

131.     To obtain the drugs used to execute Plaintiff, Defendant Bell or Defendant John Doe "Designee" will request them through Defendant John Doe Procurement Officer at RMSI who will request them from Defendant John Doe Procurement Officer at DSNF who will then order the drugs from some pharmacy or source presently unknown to Plaintiff. (Attachment B, Current Protocol p.36).

132.     A physician's order will be written by one or more of the Defendant(s) John Doe(s) Physician asking for the dispensing of the sodium thiopental, pancuronium bromide, and potassium chloride which Defendants would intend to administer to Plaintiff to cause his death. It is unclear that such "physician's order" is actually written by a practitioner who may prescribe medicine and who possesses a registration under the Controlled Substances Act. *See* 21 U.S.C. §§822, 829; 21 C.F.R. 21211301.11; 1306.04(a). It is clear, however, that such a prescription is

{44}

not issued for a legitimate medical purpose.

133.     One or more of the Defendant(s), Defendant John Doe Procurement Officer at DSNF, Defendant John Doe Procurement Officer at RMSI, Defendant John Doe Execution Team Member, and/or Defendant John Doe "Designee", will then deliver or dispense the drugs to Defendant(s) John Doe Execution Team Member(s), and/or Defendant John Doe Executioner, including Defendant Bell. (Attachment B, Current Protocol p.37).

134.     The Current Protocol fails to indicate how "the Warden or his designee" chooses one member from the Execution Team who has access to the Lethal Injection Chemicals during their procurement and storage. (Attachment B, Current Protocol p.36). The Current Protocol indicates that "the Warden or his designee" instructs one member of the Execution Team to "check[] the supply of chemicals and expiration dates," to order additional chemicals, to pick up the additional chemicals and deliver them to RMSI, and to "inventory" the chemicals prior to an execution date. (Attachment B, Current Protocol p.36). The Current Protocol fails to indicate what qualifications, training, and screening is done to insure that the Execution Team Member who is given this access to the "Lethal Injection Chemicals" (two of which are scheduled narcotics) does not have a criminal background, mental health issues, personnel and disciplinary issues, or drug or alcohol issues. It fails to indicate what screening is done to insure that the Execution Team Member who is given this access to the "Lethal Injection Chemicals" is trained and qualified at procuring, storing and transporting the "Lethal Injection Chemicals."

135.     The Current Protocol fails to indicate who prepares, mixes and administers the "Lethal Injection Chemicals" (other than "one member of the execution team") and what training, education, licensing, or screening any member of the Execution Team has in the

{45}

preparation, mixing and combining of the chemicals, drawing the chemicals into syringes and the administration of the chemicals. (Attachment B, Current Protocol p.38). Based on the vague descriptions of the Execution Team, there is no one who has pharmaceutical training or knowledge of drug compounding to mix the drugs. Moreover, the Current Protocol provides only that "another member of the execution team observes and verifies that the procedure has been carried out correctly." *Id.* Again, the Current Protocol fails to indicate what training, education, or licensing, or any screening any Execution Team Member has for observing the mixing of the "Lethal Injection Chemicals," drawing them into the syringes and administering the chemicals to make sure it is done correctly. There is no quality control to assure that the chemicals have actually been mixed correctly and at the proper dosage and that they are administered correctly.

### ii.    Anesthesia And Consciousness With sodium thiopental

136.    There are differing levels of anesthesia, and thus consciousness.

137.    The way the human body reacts to various stimuli differs depending upon the level of anesthesia. For example, when a person is administered sodium thiopental, they will continue to have the following states of consciousness at the following serum levels of pentothal:

a.    0-13 mg/l: Consciousness;
b.    13-18 mg/l: Loss of purposeful movement in response to verbal stimulation;
c.    23-28 mg/l: Loss of purposeful movement in response to tetanic nerve stimulation;
d.    33-46 mg/l: Loss of purposeful movement in response to trapezius muscle squeeze;
e.    45-57 mg/l: Loss of movement in response to larangoscopy;
f.    63 mg/l >: Loss of movement in response to intubation.

Attachment DD, *Thiopental Pharmacodynamics.*

{46}

138.    Upon administration of sodium thiopental, EEG brain activity peaks at 13.3 mg/L, after which it drops back to normal activity at 31.2 mg/L, and zero brain waves per second occurs only with serum levels above 50 mg/L.

139.    Anesthesia is the process of blocking the perception of pain and other sensations, creating insensibility to pain.

140.    Sodium thiopental is an ultra-short acting barbiturate wherein the induction of anesthesia occurs quickly, but its effect wears off in a matter of minutes.

141.    The effectiveness of sodium thiopental differs based on whether it is administered intravenously or *via* inhalation of gas.

142.    Sodium thiopental is used as an anesthetic in surgery because it enables an anesthesiologist to quickly awaken a patient should complications arise.  It is usually used only during the preliminary phase of anesthesia administration and not for general anesthesia.

143.    The Current Protocol uses 5 grams of sodium thiopental, dispensed in four syringes, for the purpose of "general anesthesia" (Attachment B, Current Protocol p. 35).  The Current Protocol fails to educate its readers (the Execution Team) about the rate and time of Sodium Thiopental's onset, but also about its rapid withdrawal rate and that it is likely to cause pain and inflict burns if the drug is not properly dissolved or infiltrates to surrounding tissue.

144.    The Committee which established the use of 5 grams of sodium thiopental to allegedly effect "general anaesthesia" and death by "one lethal 5 gram dose," *see* Attachment B, Current Protocol p.35; Attachment A, Report p.7, acknowledges that "the effect and required dosage of sodium thiopental [is] less predictable and more variable... ." *See* Attachment A, Report p.8.  Thus, the Committee has displayed deliberate indifference to the risk of pain and

{47}

suffering by directing the use of one generic dose of sodium thiopental to supposedly achieve a proper level of anesthesia while at the same time knowing its effect upon the condemned is unpredictable.

145.    The use of sodium thiopental by untrained personnel greatly increases the risk that a prisoner would not receive the necessary amount of anesthetic prior to being paralyzed and suffocated by the pancuronium bromide and then experiencing the painful internal burn of the potassium chloride.

146.    The Current Protocol fails to address an individual prisoner's weight, medical condition and medical history as related to the dosage of sodium thiopental necessary to effectively anesthetize him, but instead just indicates that a 5 gram dose will be given. (Attachment B, Current Protocol p.35).

147.    The Current Protocol requires the use of 10 boxes of 500 mg. of thiopental. (Attachment B, Current Protocol p.38).  The Current Protocol fails to include the proper instructions for mixing sodium thiopental: for example, it fails to identify what the sodium thiopental should be mixed in, whether it is to be mixed all together (10 boxes in one mixing container) or one box at a time, what instrument is to be used to actually mix the solution, how the syringes should be filled, how many syringes should be filled per box of powder, or what precautions are taken to avoid settling or contamination of the sodium thiopental.  (Attachment B, Current Protocol p.38).  Moreover, the requirement that ten boxes of sodium thiopental be used is unnecessary and increases the risk that the sodium thiopental will be improperly mixed, combined and administered.  This procedure unnecessarily increases the risk of error regarding proper mixture and effectiveness of the chemical.

{48}

148.    The Current Protocol directs the Execution Team to practice with saline and not the Lethal Injection Chemicals. (Attachment B, Current Protocol p.33). This unnecessarily increases the risk that the sodium thiopental will not be mixed and combined properly. It unnecessarily increases the risk that the three drugs will not be drawn properly into the syringes or properly pushed into the IV line. The result is an unnecessary risk that the condemned will not be properly anesthetized and will unnecessarily suffer a painful and tortuous death by asphyxiation from pancuronium bromide while simultaneously feeling the extreme chemical burn from the injection of potassium chloride.

149.    The Current Protocol for execution by electrocution contains specific instructions for mixing a sodium chloride solution. (Attachment B, Current Protocol p.35). Such specific instructions are absent for mixing the sodium thiopental used for lethal injection, thus evincing deliberate indifference to the risk that the sodium thiopental will not be properly mixed and/or properly drawn into the syringes and/or properly administered causing the condemned to not be properly anesthetized and unnecessarily suffer a painful and tortuous death by asphyxiation from pancuronium bromide while simultaneously feeling the extreme chemical burn from the injection of potassium chloride.

150.    The Current Protocol requires the Lethal Injection Chemicals to be prepared three hours before an execution. (Attachment B, Current Protocol p.38). The sodium thiopental could be sitting in the tray, in solution form, settling and degrading for up to 25 hours and 59 minutes before being used in the execution. This unnecessarily increases the risk that the condemned will not be properly anesthetized and will unnecessarily suffer a painful and tortuous death by asphyxiation from pancuronium bromide while simultaneously feeling the extreme chemical

{49}

burn from the injection of potassium chloride.

151.    Findings made as a result of the autopsy of Robert Coe show that his serum
thiopental levels were 10 mg/L. This level is inadequate for unconsciousness. (Attachment AA,
2007 Affidavit of Dr. Lubarsky, p.5-6 ¶20-21). Philip Workman's serum thiopental levels were
18.9 mg/L which means he was not fully anesthetized during his execution. (Attachment EE,
2010 Affidavit of Dr. Lubarsky p. 5). Steve Henley's levels were 8.31 mg/L, which is also
inadequate to be fully anesthetized during the execution. (Attachment BB, Henley Autopsy
Bates p.02, 06, 09; Attachment EE, 2010 Affidavit of Dr. Lubarsky p.6).

152.    The Current Protocol fails to provide for any monitoring of anesthetic depth as is
necessary when using sodium thiopental. (Attachment B, Current Protocol p.43). The only
monitoring provided for by the Current Protocol is monitoring of the IV site *via* close-circuit
camera, which is inadequate. *Id.* There is no monitoring of the condemned for anesthetic depth.
There is no monitoring of the IV lines and tubing during the administration of the drugs. The
Current Protocol for execution by electrocution requires monitoring for "visible muscle
movement" to determine the effectiveness of the electrocution. (Attachment B, Current Protocol
p.74). No such monitoring with respect to the sodium thiopental is required. Thus, this
procedure evinces deliberate indifference to the risk that the sodium thiopental will not be
properly dosed, mixed and/or drawn into the syringes and administered causing the condemned
to not be properly anesthetized and unnecessarily suffer a painful and tortuous death by
asphyxiation from pancuronium bromide while simultaneously feeling the extreme chemical
burn from the injection of potassium chloride.

153.    Lack of monitoring, inadequately skilled personnel and the known risk of

{50}

ineffectiveness of sodium thiopental have caused inadequate anesthetic states in executions in the United States, including jurisdictions considered by the Committee. Such botched executions, meaning inadequate anesthetic states when prison personnel administer sodium thiopental, were known or should have been known to the Committee. Instead, the Committee deliberately ignored this information when it stated that "5 grams of sodium thiopental would render a person unconscious within a few seconds, and its anesthetic depth would continue until death." (Attachment A, Report p.7).

154. The Current Protocol does not require in the death chamber any personnel to monitor and determine if there is a blockage in the intravenous line or to evaluate whether a prisoner is properly sedated before proceeding with the painful parts of the execution process. The design of the Execution Chamber and the Lethal Injection Room, the restraints, the dressing and tape obscure and/or distort any view of the catheter, surrounding body area and tubing.

155. As a result, Mr. West will be inadequately anesthetized under the Current Protocol, and as shown *infra*, will experience an excruciatingly painful and horrifying death as a result of the conscious asphyxiation caused by the use of pancuronium bromide and the painful internal burn and potential cardiac arrest caused by the introduction of potassium chloride. Past experience of executions by the State of Tennessee shows a demonstrated risk of severe pain.

### iii. Pancuronium bromide (Pavulon)

156. Pancuronium bromide, marketed under the name Pavulon, is a neuromuscular blocking agent which causes paralysis of the skeletal muscles of an individual. While pancuronium bromide paralyzes the diaphragm to prevent breathing, it does not affect the heart muscle.

{51}

157.     Pancuronium bromide does not affect the brain or nervous system, nor does it block the actual reception of nerve impulses in the brain or the passage of such impulses within the brain. Pancuronium bromide does not affect consciousness or the sensation of pain or suffering. An individual under the influence of pancuronium bromide, though paralyzed, still has the ability to think, is still oriented to where he is, and is able to experience fear or terror, to feel pain, and to hear.

158.     The Current Protocol uses two syringes containing a total of 100mg/100mL of pancuronium bromide as a "muscle paralytic" that will "assist in the suppression of breathing and insure death." (Attachment B, Current Protocol p.35). The use of pancuronium bromide under the Current Protocol to paralyze Plaintiff greatly increases the risk that he will be subjected to a painful and protracted death.

159.     Pancuronium bromide, administered by itself as a "lethal dose," would not result in a quick death; instead, it would ultimately cause someone to asphyxiate or suffocate to death while still conscious.

160.     Death by asphyxiation or suffocation constitutes cruel or unusual punishment.

161.     If an individual is not properly anesthetized when injected with pancuronium bromide, he will consciously experience extreme pain and terror while being completely paralyzed. In this state, the person will undergo the terrorizing and excruciating experience of suffocation without the ability to move or to express the pain and suffering which he is experiencing as he is being suffocated.

162.     Because pancuronium bromide paralyzes all skeletal muscles including facial muscles and those used to speak or communicate through noises, an observer cannot detect, from

{52}

outward appearance, any expression of pain, horror, or suffering experienced because of the use of pancuronium bromide or suffering from any other source, such as potassium chloride which will activate the nerves of the venous system causing an extreme burning pain. *See infra.*

163.     The Current Protocol fails to educate its readers (the Execution Team) regarding the true nature of pancuronium bromide – that its paralytic nature blocks the ability to determine if someone is in pain. (Attachment B, Current Protocol p.35).

164.     There is no legitimate penological purpose and no legitimate state interest for the use of pancuronium bromide articulated in the Current Protocol, or otherwise. The use of pancuronium bromide is not narrowly tailored to any compelling state interest articulated in the Current Protocol, or otherwise. *See* Attachment B, Current Protocol p.35; Attachment A, Report p.7-8. Chancellor Ellen Hobbs Lyle has explained that pancuronium bromide as used in the Current Protocol (as well as the Old Protocol) is unconstitutional: "[T]he use of Pavulon is . . . unnecessary. . . [T]he State [has] failed to demonstrate any reason for its use. The record is devoid of proof that the Pavulon is needed. Thus, the Court concludes that . . . the State's use of Pavulon is . . . in legal terms 'arbitrary.'" *Abdur'Rahman v. Sundquist*, No. 02-2236-III, opinion p.13 (Tenn. Ch. 20th Jud. Dist. June 2, 2003).

a.     The Committee which adopted the three-drug protocol set forth no compelling state interest for the use of pancuronium bromide. It does not speed or contribute to the death process. *See* Attachment A, Report p.7. The Committee acknowledges that without the use of pancuronium bromide, the condemned would be able to move and communicate if not properly anesthetized. *Id.* at p.7-8. This would allow the condemned to communicate if the sodium thiopental did not properly anesthetize the person. The Committee, instead, arbitrarily attributes

{53}

any such movement as "involuntary movement which might be misinterpreted as a seizure or an indication of consciousness." *Id.* at p.8. This is especially egregious since the Tennessee Protocol does not provide for any check for consciousness following administration of the sodium thiopental. Thus the Committee has displayed deliberate indifference to assuring that the condemned is properly anesthetized or to account for any contingency planning in the improper mixing and/or administration of the sodium thiopental thus creating an unnecessary risk of pain and suffering.

b. The Committee noted pancuronium bromide, when properly administered, "prevents involuntary muscular movement." (Attachment A, Report p.7). However, using pancuronium bromide to prevent such movement "that *may* interfere with the proper functioning of the IV equipment," *id.*, is not necessary nor narrowly tailored to meet the stated objective. Under the Current Protocol, the prisoner's arms are securely restrained to the gurney (Attachment B, Current Protocol p.64); the catheters are covered with dressing (Attachment B, Current Protocol p.42); the IV lines are taped in place near the catheter (*id.*); and the prisoner's hands are taped in place. (Attachment B, Current Protocol p.43). There is a final inspection of the restraint devices to insure the condemned is secure on the gurney. (Attachment B, Current Protocol p.14). These restraining devices are designed to keep the body parts containing catheters and IV lines still; there is no need to also paralyze the prisoner. Moreover, movements observed during actual executions are not caused by proper administration of the first drug, sodium thiopental, which is supposed to place the prisoner under a surgical plane of anesthesia. Movements observed during actual executions are caused when the second drug, pancuronium bromide, suffocates the person and his chest heaves as he gasps for air. Thus, the very drug purportedly used to prevent

{54}

movements of the body actually induces such movements.

c.     The use of pancuronium bromide in the Current Protocol is arbitrary, unreasonable, degrading to human dignity, shocks the conscience and serves no legitimate interest. Because pancuronium bromide causes paralysis, suffocation, and the suffering attendant to such paralysis and suffocation, in 2001, Tennessee declared in the "Nonlivestock Humane Death Act" (TENN. CODE ANN. § 44-17-301, *et seq*.) that pancuronium bromide cannot be used to euthanize animals, because its use is not humane. Where the use of pancuronium bromide is not "humane" to use on non-humans, it is arbitrary and shocks the conscience to claim that its use is "humane" on humans. Its use on humans to cause death violates basic precepts of human dignity.

165.     The Current Protocol fails to insure the proper storage and effectiveness of pancuronium bromide before its use (assuming it is to effect a quicker death). The Current Protocol acknowledges that pancuronium bromide "must be refrigerated at approximately 40 degrees." (Attachment B, Current Protocol p.36). The Committee Report acknowledges that use of a one-drug protocol would entail less risk because it would "not require refrigeration." (Attachment B, Current Protocol p.8). However, the Current Protocol directs that three hours before the scheduled execution, the pancuronium bromide, and other Lethal Injection Chemicals, will be moved to the Lethal Injection Room. (Attachment B, Current Protocol p.38). The pancuronium bromide could remain in the Lethal Injection Room, at room temperature or higher, for up to 25 hours and 59 minutes before being used. This procedure and handling of pancuronium bromide demonstrates deliberate indifference to the unnecessary risk of pain and suffering by failing to insure the effectiveness of the drug before its use (assuming it is to effect a

{55}

quicker death).

166.    Death caused by the use of pancuronium bromide is gruesome, horrible, and painful. pancuronium bromide could not lawfully be used alone as the fatal agent because causing death by suffocation violates the Eighth Amendment's prohibition against cruel and unusual punishment.

### iv.    Potassium chloride

167.    In the Current Protocol, potassium chloride is the stated means for "cardiac arrest and rapid death." (Attachment B, Current Protocol p.35).

168.    The administration of potassium chloride activates all the nerve fibers inside the venous system. Because veins are replete with nerve fibers, the administration of potassium chloride into the veins creates extreme pain.

169.    In the absence of adequate anesthesia, the introduction of potassium chloride creates extreme and excruciating pain. The Current Protocol fails to educate its readers (the Execution Team) about the true nature of potassium chloride – that it would cause extreme pain in someone who is not properly anesthetized. (Attachment B, Current Protocol p.35).

170.    The Current Protocol lacks any provision for ascertaining the level of the prisoner's anesthetic depth before introduction of the potassium chloride.

171.    Under the Current Protocol, 100 mL of 2 mEq/mL, or 100 mg/mL of 2mEq/mL, of potassium chloride is introduced via two syringes into the body through a vein, usually in the arm. This method of administering this amount of potassium chloride is inadequate to stop the heart.

172.    It takes a serum concentration of more than 16 mEq/L (16mmol/L) of potassium

{56}

to arrest the heart.  (Attachment GG, Ramsey Affidavit, p.6 ¶XXIV, p.7 ¶XXVI).

173.    It is a pathophysiological impossibility for the heart to succumb to electro
mechanical arrest due to the potassium component of the Current Protocol.  (Attachment GG,
Ramsey Affidavit, p.9 ¶XXXII).

174.    The autopsy of Robert Coe, executed in Tennessee, demonstrates that his vitreous
potassium was 9 mEq/L (9mmol/L), far short of the required minimum 16.4 mEq/L to cause
electro mechanical arrest of the heart.  (Attachment GG, Ramsey Affidavit p.8 ¶XXX).  Steve
Henley's potassium level was not elevated and would have had no effect on his heart..
(Attachment BB, Henley Autopsy Bates p.02, 06; Attachment EE, 2010 Affidavit of Dr.
Lubarsky p.6-7).

175.    One of the main contributing factors to low potassium concentration solutions
reaching the heart would be that, given an intravenous injection, the solution would necessarily
have to pass through the lungs (which have the surface area of approximately that of a tennis
court) during which the potassium concentrations would fall dramatically.  (Attachment GG,
Ramsey Affidavit p.8 ¶XXIX).

176.    Using an amount of, and method of administering, potassium chloride which does
not arrest the heart is meaningless and arbitrary and without a legitimate or compelling purpose.
It will not hasten or effect death.  It will only inflict excruciating pain if the condemned is not
properly anesthetized.  Instead, the killing agent will be the pancuronium bromide meaning death
by suffocation or asphyxiation

177.    If Mr. West remains conscious during the administration of the potassium
chloride, he will suffer excruciating pain.  Due to the paralysis induced by the pancuronium

{57}

bromide, he will have no alternative reasonable and effective means to communicate the fact that he was not properly anesthetized. He will suffer a terrifying and painful death by suffocation.

      **v.**    **Death Under Tennessee's Lethal Injection Protocol**

178.    The person being lethally injected under the Current Protocol actually dies from the suffocation caused by the pancuronium bromide and the resulting anoxic state, and not from cardiac arrest due to the administration of potassium chloride.

179.    Because the person being lethally injected under the Current Protocol is likely inadequately anesthetized, he experiences the sensation and horror of suffocation from the pancuronium bromide, as well the excruciating pain associated with the introduction of potassium chloride.

**D.**    **TENNESSEE'S LETHAL INJECTION PROTOCOL IS NOT SUBSTANTIALLY SIMILAR TO THE KENTUCKY PROTOCOL APPROVED BY THE SUPREME COURT IN *BAZE V. REES*, 553 U.S. 35 (2008).**

180.    Tennessee's protocol is substantially different from Kentucky's protocol approved by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008).

181.    The three-drug protocol as implemented in Tennessee contains substantial risk that is compounded by deficiencies and a lack of safeguards not seen in Kentucky.

182.    Tennessee's protocol does not include important safeguards recommended by the Committee and adopted by other states. *Harbison*, 511 F.Supp.2d at 895. "[T]he most glaring omission" is a check for consciousness before the pancuronium bromide is administered. *Id.* at 884.

183.    "Kentucky's protocol specifically requires the warden to redirect the flow of chemicals to the backup IV site if the prisoner does not lose consciousness within 60 seconds"

{58}

and to watch for signs of infiltration. *Baze*, 553 U.S. at 56. The Tennessee Protocol does not.

184.     The Tennessee Protocol's failure to provide a check for consciousness or monitoring for signs of infiltration "greatly increased the risk of pain because the pancuronium bromide would make it impossible for Warden Bell to determine if [the inmate] is suffering." *Harbison*, 511 F.Supp.2d at 884. Additionally, Warden Bell does not know what signs to look for should infiltration occur. *See Harbison*, 571 F.3d at 540 fn.1 (Clay, J., dissenting). These are significant differences from the Kentucky protocol.

185.     Tennessee officials recognized and a district court has found, "the failure to check for consciousness greatly enhances the risk that the inmate will suffer unnecessary pain." *Harbison*, 511 F.Supp.2d at 884. The Kentucky court did not so find.

186.     One of the primary reasons that the *Baze* Court concluded Kentucky's protocol did not present a "substantial" risk of harm from an improper administration of sodium thiopental was this check for consciousness. *Baze*, 128 S.Ct. at 1534 ("it was the explicit measures Kentucky took to ensure the proper administration of sodium thiopental that made the protocol in Baze constitutional."). Again, this critical step is lacking from the Tennessee Protocol.

187.     Other shortcomings in Tennessee's protocol create substantial risks not present in the Kentucky protocol. "The risk created by Tennessee's decision not to check for consciousness is compounded by Tennessee's choice of individuals to mix and inject the drugs and monitor the IV lines during executions." *Harbison*, 511 F.Supp.2d at 886. Similar shortcomings were not found in Kentucky's protocol or in Kentucky's personnel.

188.     Ralph Baze conceded, and the Kentucky courts found, that "'if performed

{59}

properly,' an execution carried out under Kentucky's procedures would be 'humane and constitutional.'" *Baze,* 553 U.S. at 49. West does not so concede. A federal district court found that Tennessee's Protocol contains inherent, significant risks of error, even when properly followed. *Harbison,* 511 F.Supp.2d at 891 ("This is not a mere 'risk of negligence' but a guarantee of accident, written directly into the protocol itself."); *see also id.* at 880-82.

189.     There is an inherent risk that even an initially properly inserted catheter will slip from the vein during the injections of the lethal drugs. There is also a risk that "a person inserting an IV might get 'false positives' showing that an IV was inserted properly when, in fact, it was not." Expert testimony in *Harbison* showed that IV catheters do move "with a fairly high frequency," from veins into outer tissue even in a clinical setting. *Id.* at 889. Dr. Dershwitz, an expert witness for the State of Tennessee in *Harbison,* stated that '[s]ometimes intravenous catheters fail' and that if the only individuals who are trained in monitoring IV lines leave the room following insertion of the catheters--which is what the new protocol dictates--he 'think[s] it is logical to assume that there's an increased risk.'" *Id.* at 888. The Kentucky court did not make similar findings.

190.     A district court has found IV disruption is much more likely to occur under Tennessee's protocol where untrained executioners administer large amounts of bolus injections, from far away, through long IV lines, "'without direct visual contact and without tactile contact,' all of which [are] 'set-ups for failure and mistakes.'" *Id.* at 889. The Kentucky court did not make similar findings. Accordingly these facts were not present in the Supreme Court's analysis of the Kentucky protocol.

191.     Under Tennessee's Current Protocol swelling might not occur in surrounding

{60}

tissue, and other signs of 'infiltration' might not be present," thus, making detection by untrained executioners unlikely. *Id.* at 890. Under the Current Protocol, such errors could not be detected by remote visual observation of the injection site, especially at the antecubital fossa, and that the IV Team members and the Executioners were "largely ignorant" about reliable ways to detect infiltration. *Id.* This is another significant difference from the Kentucky court's finding that errors in administration of the anesthetic under Kentucky's protocol could easily be detected by a lay person looking for swelling at the injection site. *Baze*, 553 U.S. at 56.

192.    A further important distinction is that, under Kentucky's protocol, the training level of personnel performing executions was found not to pose a substantial risk of pain to Baze, in light of safeguards included in the protocol. *Id.* In contrast, the Executioners selected under Tennessee's protocol "received only very limited instruction, and that instruction relates to the tasks of the IV Team Members, not the actions they are actually charged with performing." *Harbison*, 511 F.Supp.2d at 891. During practice sessions, the Executioners "do not receive any instruction . . . from the paramedics or any other medically qualified individuals. They do not troubleshoot potential problems that might occur, such as catheter infiltration, but simply practice performing their functions with saline solution." *Id.* at 887.

193.    A further factor in this analysis is the fact that "the decision to remove the paramedics from the execution chamber before the administration of the drugs would 'certainly increase the risk' of pain." *Id.* at 889. The *Harbison* Court found "[t]he conclusion that somehow the 'participation of the certified IV team' in inserting the catheters and the 'presence of a doctor,' who is standing in a garage, somehow makes up for the failure to monitor the inmate for consciousness before the injection of the two drugs likely to cause pain is entirely

{61}

unwarranted by the evidence . . ." *Id.* at 900. Thus, "the failure to utilize adequately trained executioners increases the plaintiff's [Harbison's] risk of unnecessary pain." *Id.* at 891. Similar findings were not made about the Kentucky protocol.

194. Experts told Tennessee officials that "with regard to mixing the sodium thiopental (the first drug), '[y]ou need someone who knows how to show them how to mix--a pharmacist, a nurse, or an anaesthesiologist.'" *Harbison*, 511 F.Supp.2d at 876; *See* Lubarsky testimony, *Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-1206, DE. 142, TR657; *see* Physician A testimony, *id.*, DE. 142, TR497, 503-04. Tennessee, instead, selected a person without training in mixing sodium thiopental but who had once watched a Texas executioner perform the same task. *Harbison*, 511 F.Supp.2d at 886-87, 897. The *Harbison* Court found this compounded the risk of harm in the three-drug protocol as implemented in Tennessee. *Id.* Similar findings were not made about Kentucky's implementation of its protocol.

195. Another factor further distinguishes Tennessee's protocol from Kentucky's. The new Tennessee Protocol eliminated a safeguard that existed under the old protocol. *Id.* at 898.

196. The Tennessee Protocol, when performed as written, does not sufficiently anesthetize the condemned prisoner. Evidence from past Tennessee executions shows this. See Workman, Coe and Henley autopsies, Attachments Y, Z and BB, respectively. Kentucky's protocol does.

197. The only drug to reach lethal levels in the inmates executed under Tennessee's protocol is pancuronium bromide. This fact was not found under the Kentucky protocol.

198. Finally, in stark contrast to the *Baze* case, Tennessee officials failed to adopt an alternative one-drug protocol which they knew was feasible, was recommended by the Protocol

{62}

Committee and all of the consulting experts, and which would eliminate the risks of pain inherent in Tennessee's three-drug protocol. The *Harbison* Court found "that Commissioner Little's rejection of the one-drug protocol, and the failure to provide for any of the safeguards considered by the Committee, constitutes deliberate indifference[ ]" to "a substantial risk of serious harm . . . ." *Id.* at 898. Kentucky officials did not adopt a protocol with deliberate indifference to a substantial risk of serious harm.

199.    Tennessee's Current Protocol differs in substantial aspects to the Kentucky protocol.

## COUNT I

**42 U.S.C. §1983: THE HISTORY AND PRACTICE OF EXECUTIONS UNDER TENNESSEE'S CURRENT PROTOCOL IS SUBSTANTIALLY DIFFERENT FROM THE PRACTICE APPROVED IN KENTUCKY BY THE UNITED STATES SUPREME COURT IN *BAZE V. REES*, 553 U.S. 35 (2008). BY ADOPTING AND CONTINUING TO USE THE CURRENT PROTOCOL, DEFENDANTS HAVE SHOWN DELIBERATE INDIFFERENCE TO THE UNNECESSARY AND WANTON INFLICTION OF PAIN AND PROLONGED DEATH AND HAVE CREATED A SUBSTANTIAL RISK OF THE UNNECESSARY AND WANTON INFLICTION OF PAIN IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS. (DEFENDANTS RAY, BELL, MILLS, AND HODGE)**

200.    Plaintiff incorporates the preceding paragraphs in their entirety.

201.    Defendants Ray and Bell either participated in, or have been held out as participating in, the drafting and promulgation of the Current Protocols.

202.    The Eighth Amendment prohibits executions which "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 154 (1976), or which "involve torture or a lingering death." *In re Kemmler*, 136 U.S. 436, 447 (1890) *citing Wilkerson v. Utah*, 99 U.S. 130, 135 (1878); *Gregg*, 428 U.S. at 170. Unnecessary and wanton infliction of pain is defined as the gratuitous infliction of suffering. It is not limited to physical pain, but includes

{63}

psychological torture as well. *Calhoun v. DeTella,* 319 F.3d 936, 939 (7th Cir. 2003). Prolonging a person's wait for impending death constitutes psychological torture. *Francois v. Wainwright,* 741 F.2d 1275, 1286-87 (11th Cir. 1984).

203.    Defendants Ray and Bell knowingly created the Current Protocol which poses a substantial risk of serious harm, unnecessary and wanton infliction of pain and suffering and lingering death.

204.    Defendants are obliged to provide medical care for prisoners and a "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain [] proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity of a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004). There is no question that deprivation of adequate anesthesia before introduction of the second and third drugs causes extreme terror and pain. Proper anesthesia in the lethal injection process is a sufficiently serious medical need. The history and practice of lethal injection under the current Protocol in Tennessee shows that condemned prisoners are inadequately anesthetized and therefore suffer a painful and agonizing death by suffocation.

205.    In any execution, issues whether foreseen or unforeseen, may arise. Problems with equipment, personnel, procedures, *etc.*, occur with sufficient regularity. Yet, the Current Protocol fails to include contingency plans when such problems occur.

206.    Prison policy in almost all areas, including medical care, routinely specifies contingency plans to be followed when such problems occur. These policies are specific.

{64}

Tennessee's policy is that "[i]nmates in the physical custody of TDOC shall have timely access to the appropriate level of healthcare on a twenty-four (24) hour a day basis. TDOC Policy Statement, No. 113.30, Sec V (2004). "Appropriate level" of care includes that basic care which prevents significant pain or discomfort.

207.     Defendants are required to provide Mr. West with appropriate medical care until the moment of his death, consequently the Eighth Amendment and Tennessee Constitution Article 1, § 16 mandate that the death penalty be administered without "deliberate indifference" to the "unnecessary and wanton infliction of pain."

208.     Obvious and unnecessary pain and suffering requires an appropriate level of care under *Estelle, supra,* and TDOC Policy, especially when it occurs as a means of punishment. *Gregg, supra; In re Kemmler, supra.* Failure to ameliorate the known risks of unnecessary pain and lingering death during an execution gives rise to a claim of deliberate indifference. *Horn v. Madison County Fiscal Court,* 22 F. 3d 653, 660 (6th Cir. 1994) (a claim of deliberate indifference attaches when the Plaintiff "demonstrate[s] deliberateness tantamount to intent to punish").

209.     The Current Protocol developed by Defendants Ray and Bell and by which Defendants intend to execute Mr. West does not sufficiently protect him from deliberate indifference as guaranteed by the Eighth and Fourteenth Amendments.

210.     Claims of deliberate indifference have both an objective and subjective component. *Comstock v. McCrary,* 273 F. 3d 693, 702 (6th Cir. 2001). Satisfaction of the objective component occurs when the Plaintiff alleges a "sufficiently serious" medical need. *Id.* at 703. There is a "sufficiently serious" medical need when "even a lay person would easily

recognize the necessity of a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004).

211. "To satisfy the subjective component, [of a deliberate indifference claim] the Plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* Defendants were aware of the risks inherent in the Current Protocol, based on prior lethal injection litigation in Tennessee and ongoing lethal injection litigation in fourteen other states and the District of Columbia, but persisted with deliberate indifference in promulgating a protocol that had been declared unconstitutional by other federal courts and unusable by Governors of other states, and that will cause an excruciatingly painful and horrifying death from the use of these three drugs by untrained personnel. *See* Attachment A, Report.

212. Defendants knew about the substantial risks involved in execution by lethal injection but disregarded those risks and failed to make changes and incorporate safeguards into the Current Protocol. Unlike the protocol approved in *Baze v. Rees*, 553 U.S. 35 (2008) Tennessee's Protocol was adopted without including necessary safeguards. Furthermore, unlike Kentucky, Tennessee's experience with its Protocol shows a history of torturous executions, and yet, all Defendants continue to adhere to it.

213. Although it is possible to conduct executions in a constitutionally compliant manner, Defendant Ray and Bell, Committee Members, chose not to do so. By adhering to the Current Protocol despite autopsy results that demonstrate its unconstitutionality, all Defendants are acting with deliberate indifference.

{66}

a.     The Defendants could choose to use different chemicals that pose a low risk of administration error yet do not cause extraordinarily grave consequences to a condemned inmate if not properly administered. Despite recommendations from the Committee charged with re-working the Protocol, the Defendants deliberately chose not to use a one or two drug protocol, but to continue with a three-drug protocol. (Attachment A, Report p.6-8). Defendants acknowledge the three-drug "procedure is the most complicated of the three protocols" they considered and "presents the greatest difficulty in accounting for the lethal injection chemicals, particularly because pancuronium bromide requires refrigeration." (Attachment A, Report p.7-8). Defendants knowingly or recklessly chose the three drugs and chose to use those drugs in a manner that poses a high risk of administration error resulting in an unnecessarily painful and lingering death.

b.     Defendants have not taken precautions to insure that personnel involved in an execution by lethal injection are not under the influence of intoxicating or mind-altering substances.

c.     Defendants have not taken precautions to insure that the personnel who set up the IV lines and insert the catheters have the training, experience, and expertise needed to perform those functions. This is a substantial difference from the Kentucky protocol where no such finding has been made.

d.     Defendants have not taken precautions to insure that the personnel who prepare and administer the lethal injection chemicals possess the training, experience, and expertise needed to administer those chemicals properly.

e.     Defendants have not taken precautions to insure that the condemned is adequately

{67}

anesthetized before administering the second and third drugs. Kentucky's protocol contains just such a safeguard. This lack of precaution in Tennessee's Protocol makes it substantially different from that of Kentucky's.

  f.  Defendants have not adequately provided for contingency plans, personnel and equipment. Furthermore, Tennessee's removal of any trained personnel from the execution chamber means that no one is directly monitoring the inmate for signs of infiltration. This is different from Kentucky where the "protocol specifically requires the warden to redirect the flow of chemicals to the backup IV site if the prisoner does not lose consciousness in sixty seconds." *Baze v. Rees*, 553 U.S. at 56. In addition, no one checks for the possibility of IV slippage. Unlike Kentucky, there is no direct visual or tactile contact with the condemned.

  g.  Defendants have not incorporated "best practices" from other lethal injection jurisdictions.

  214.  The person being lethally injected under the Current Protocol actually dies from the suffocation caused by the pancuronium bromide and the resulting anoxic state, and not from cardiac arrest due to the administration of potassium chloride. (Attachment GG, Ramsey Affidavit p.2 ¶VI, p.9 ¶XXXII). The history of executions in Tennessee using lethal injection bears this out.

  215.  Because the person being lethally injected under the Current Protocol is likely inadequately anesthetized, he experiences the sensation and horror of suffocation from the pancuronium bromide, as well the excruciating pain associated with the introduction of potassium chloride. There is, therefore, a substantial risk of the State inflicting a cruel and unusual punishment.

{68}

216. Executing Mr. West by means of the Current Protocol is arbitrary, cruel and done with deliberate indifference. It is a violation of the Eighth and Fourteenth Amendments and a violation of Tennessee Constitution Article 1, § 16 to use an arbitrary, cruel, and/or unreliable method of execution that poses a substantial risk of inflicting unnecessary pain, particularly when this risk of unnecessary pain or lingering death is known and foreseeable.

## COUNT II

**42 U.S.C. §1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS BY THE USE OF SODIUM THIOPENTAL PURSUANT TO THE CURRENT PROTOCOL (DEFENDANTS RAY, BELL, MILLS, HODGE JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100)**

217. Plaintiff incorporates the preceding paragraphs in their entirety.

218. Inducing unconsciousness by correctly administering sodium thiopental is indispensable to preventing the wanton infliction of pain and psychological torture caused by the use of pancuronium bromide and potassium chloride in a three-drug lethal injection protocol. Unlike Kentucky, the Tennessee Protocol does not include any check for consciousness to insure that the inmate is adequately anesthetized before the pancuronium bromide is administered.

219. The use of sodium thiopental as administered under the Current Protocol does not cause sufficient anesthesia for the duration of the lethal injection process.

220. As administered under the Current Protocol, the use of sodium thiopental, as opposed to a longer-lasting anesthetic, is arbitrary, unreasonable, irrational, and serves no legitimate or compelling state interest. *See Hill v. McDonough*, 547 U.S. 573, 580 (2006) (the challenged procedure presents a risk of pain the State can avoid). It fails to provide sufficient anesthetic depth to prevent the condemned from experiencing the pain and psychological torture

{69}

of suffocation caused by pancuronium bromide and it fails to provide sufficient anesthetic depth to prevent the condemned from experiencing excruciating pain from the injection of potassium chloride and its effects, if any, on the heart.

a.    Defendants are aware of executions by lethal injection which have taken substantially longer than 2 to 5 minutes after introduction of sodium thiopental.

b.    If the intended amount of sodium thiopental fails to reach the condemned's brain (which can occur as a result of an infiltration, leakage, mixing error, or other causes) and the condemned receives a near surgical dose of sodium thiopental, the duration of narcosis will be brief and the prisoner could reawaken during the execution process.  Defendants are aware of this problem occurring.

c.    In Oregon, which has legalized physician-assisted suicide for the terminally ill, state doctors prescribe an overdose from a long-acting barbiturate, like pentobarbital.

d.    In veterinary medicine, sodium phenobarbital, a somewhat slower-acting but longer-lasting barbiturate, is used for animal euthanasia.

221.    As administered under the Current Protocol,  the use of a generic dose of sodium thiopental, as opposed to a dosage which accounts for the condemned's health history and physical condition, is arbitrary, unreasonable, irrational, and serves no legitimate or compelling state interest.  It fails to provide sufficient anesthetic depth to prevent the condemned from experiencing the pain and psychological torture of suffocation caused by pancuronium bromide and it fails to provide sufficient anesthetic depth to prevent the condemned from experiencing excruciating pain from the injection of potassium chloride and its effects, if any, on the heart.

a.    Defendants know "the effect and required dosage of sodium thiopental" as

{70}

administered under the Current Protocol, is "less predictable and more variable." (Attachment A, Report p.8), yet no checks for consciousness are done.

     b.     Mr. Coe's autopsy report shows his thiopental level was 10.2 mg/L, which is inadequate to establish unconsciousness. (Attachment Y, Coe Autopsy Bates p.13; Attachment AA, 2007 Affidavit of Dr. Lubarsky p.4).

     c.     Mr. Workman's autopsy report shows his sodium thiopental level was 18.9 mg/L, derived from blood drawn from the heart ten days after his execution, which is inadequate to establish unconsciousness. (Attachment Z, Workman Autopsy Bates p.03, 07; Attachment EE, 2010 Affidavit of Dr. Lubarsky p.5).

     d.     According to Dr. Bruce Levy, formerly Tennessee's chief medical examiner, post-mortem thiopental levels derived from heart blood may be twice as high as the thiopental level at death. (*See* Levy testimony, *Harbison v. Little*, M.D. Tenn., No. 3:06-cv-1206, DE. 142, TR734; *see also* Attachment EE, 2010 Affidavit of Dr. Lubarsky p.5). This means that Mr. Workman's actual thiopental level could have been 9 - 10 mg/L, which is even more inadequate to establish unconsciousness.

     e.     Mr. Henley's autopsy report shows his serum thiopental level was 8.31 mg/L, which is inadequate to establish unconsciousness. (Attachment BB, Henley Autopsy Bates p.02, 06; Attachment EE, 2010 Affidavit of Dr. Lubarsky p.6).

     f.     According to Dr. Levy, the executions of Robert Coe, Philip Workman, and Steve Henley were carried out in the manner intended by the Tennessee Protocol. *See* ¶¶ 50, 59, and 67, *supra/infra*.

     g.     Accordingly, the Tennessee Protocol as designed, fails to induce unconsciousness

{71}

prior to the administration of pancuronium bromide and potassium chloride. Regardless of whether Mr. West's death is later caused by the administration of pancuronium bromide or potassium chloride, the Tennessee Protocol, as designed, will result in severe and unnecessary pain in violation of the Eighth Amendment.

h.     The Current Protocol fails to account for the fact that body weight must be taken into account when using sodium thiopental as the sodium thiopental reacts differently in the body depending on weight, medical condition and history. *See* Leonardis Koniaris et al, *Lethal Injection For Execution: Chemical Asphyxiation?* PLOS Medicine, Vol. 4, Issue 4, 0651 (April 2007). Several regularly prescribed drugs at RMSI interfere with the ability of sodium thiopental to act properly as an anesthetic.

i.     The Current Protocol fails to take into account a recent study examining toxicology reports from prisoners executed by California and North Carolina, along with reports from witnesses to executions in other states, that confirms that some prisoners remained conscious during the administration of lethal drugs due to the ineffectiveness of sodium thiopental. (Attachment HH, Leonidas Koniaris, *et al.*, *Inadequate Anesthesia in Lethal Injection for Execution*, 365 Lancet 1412-1414 (2005), *see also* Attachment AA, 2007 Affidavit of Dr. Lubarsky p.3 ¶14).

222.   The absence of trained personnel to mix, combine and administer sodium thiopental and insure a prisoner is properly anesthetized before the other chemicals are introduced greatly increases the risk that a prisoner would not receive the necessary amount of anesthetic prior to being paralyzed by the pancuronium bromide and internally burned by the potassium chloride. sodium thiopental is extremely unstable, it must be carefully and properly

{72}

mixed so that it does not crystallize, a technical task that requires significant training in pharmaceutical calculations. In this respect, Tennessee's Current Protocol is substantially different from Kentucky's where no such lack of training was documented.

a. The method of mixing the sodium thiopental, as described by Defendant Bell, is not medically accepted. (Attachment AA, 2007 Affidavit of Dr. Lubarsky p.4-5 ¶17). It is not clear that thiopental can be reliably mixed at 100 mg/mL, as described by Defendant Bell. *Id.*

b. The Current Protocol fails to provide comprehensive training or instructions for mixing, combining and administering the sodium thiopental.

c. The Current Protocol unnecessarily requires the use of ten packages of sodium thiopental, which increases the risk of error in reconstituting the sodium thiopental and the risk that the condemned will not be sufficiently anesthetized.

d. Defendants are aware of problems even when a board-certified physician has been used to prepare the three drugs. *See* Attachment A, Report p.12 *citing Taylor v. Crawford.* The Current Protocol's use of untrained and unqualified persons to prepare the three drugs knowingly heightens the risk of problems with the effectiveness of the sodium thiopental (and other two drugs).

e. The AVMA requires personnel be trained and knowledgeable in anesthetic techniques, and competent in assessing anesthetic depth appropriate for the subsequent administration potassium chloride. The fact that the Current Protocol knowingly uses a short-acting barbiturate and knowingly contains no comparable requirements for the personnel who use the same drug in executing prisoners, (Attachment B, Current Protocol p.8-9), shocks the conscience of a civilized society.

{73}

223.   The Current Protocol fails to include procedures to ensure that the condemned is unconscious after the administration of sodium thiopental before initiating administration of the second and third drugs.  Kentucky's protocol provides this safeguard making it substantially different from Tennessee's.

a.   The Tennessee Committee purported to review the Florida Commission Report (Attachment A, Report p.13) but the Report fails to indicate what, if any, guidance it obtained and why proposals in the report to ensure the condemned reaches a surgical plane of anesthesia before administering the other two drugs were rejected and not included in the Current Protocol. *Compare* Attachment X, Florida Report p.11

b.   The failure of the Current Protocol to have qualified and trained personnel monitor the condemned after the administration of sodium thiopental to ensure there has been no IV access issue and to ensure that the inmate has reached an appropriate plane of anesthesia prior to administration of the other two drugs is a critical and unacceptable departure from the standards of medical care and veterinary care, and falls below the lethal injection protocols of other states, including Kentucky's.

c.   The Current Protocol prevents proper monitoring of the flow of fluids to insure the sodium thiopental is properly administered.  Proper monitoring of the flow of fluids into the vein requires a clear view of the IV site, and also tactile examination of the skin surrounding the IV site.  Merely pushing a syringe into an intravenous line is no guarantee that the drug will reach the intended recipient, nor that the recipient will experience the desired effect. (Attachment AA, 2007 Affidavit of Dr. Lubarsky p.7 ¶23).

{74}

## COUNT III

**42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS BY THE USE OF PANCURONIUM BROMIDE PURSUANT TO THE CURRENT PROTOCOL (DEFENDANTS RAY, BELL, MILLS, HODGE, JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100)**

224. Plaintiff incorporates the preceding paragraphs in their entirety.

225. The use of pancuronium bromide, as administered under the Current Protocol, violates Plaintiff's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments . Specifically, Plaintiff has a right to be free from arbitrary methods of punishment; from suffering physical pain beyond that inherent in the course of death; from suffering psychological pain; and, from a prolonged death. The use of pancuronium bromide is gratuitous, arbitrary, inhumane, violates the dignity of the human person, and is contrary to the evolving standards of decency and shocks the conscience. See *Hill v. McDonough*, 547 U.S. at 580 (the challenged procedure presents a risk of pain the State can control).

226. The autopsy report of Robert Coe demonstrates his blood level of pancuronium was 4.7 mg/L or 4700 mEq/L (4700 ng/ml ). (Attachment Y, Coe Autopsy Bates p.14). This level of pancuronium paralyzed and suffocated Mr. Coe. (Attachment AA, 2007 Affidavit of Dr. Lubarsky p.4-5).

227. The autopsy report of Philip Workman shows his blood level of pancuronium was .630 mg/L. (Attachment Z, Workman Autopsy Bates p.03, 07). Dr. Levy testified that pancuronium was the only drug to completely reach a lethal level. (*See* Levy testimony, *Harbison v. Little, et al*, M.D. Tenn., No. 3:06-cv-1206, DE. 142, TR920). This level of pancuronium paralyzed and suffocated Mr. Workman. (Attachment EE, 2010 Affidavit of Dr.

Lubarsky p.6).

228.    The autopsy report of Steve Henley demonstrates that his blood level of pancuronium was 1.6 mg/L or 1600 mEq/L (1600ng/mL). (Attachment BB, Henley Autopsy Bates p.02, 06). This level of pancuronium paralyzed and suffocated Mr. Henley. (Attachment EE, 2010 Affidavit of Dr. Lubarsky p.6-7).

229.    According to Dr. Levy, the executions of Robert Coe, Philip Workman, and Steve Henley were carried out in the manner intended by the Tennessee Protocol. *See* ¶¶ 50, 59, and 67, *infra*.

230.    Pancuronium bromide could not lawfully be used alone as the fatal agent. It would result in a prolonged death; ultimately causing someone to suffocate or asphyxiate to death. Suffocation is physically painful in that a person feels an unbearable crushing pressure in the chest. Suffocation creates several minutes of psychological terror in that a person, unable to breathe, gasps and heaves in vain for air while anticipating death. Yet, because of the paralyzing effect of the pancuronium bromide, there would be additional torment in that the condemned would be unable to move or communicate the agony. Causing death by suffocation or asphyxiation violates the Eighth Amendment's's prohibition against cruel and unusual punishment.

231.    The use of pancuronium bromide is gratuitous. Defendants who adopted the three-drug protocol set forth no compelling state interest for the use of pancuronium bromide. It does not speed or contribute to the death process; it causes excessive physical and psychological pain; and, by masking consciousness of the prisoner, it prevents any remedial acts should the sodium thiopental fail to place the prisoner in a surgical plane of anesthesia. pancuronium

{76}

bromide serves no legitimate medical purpose during execution.

a. Defendants acknowledged that without the use of pancuronium bromide, the condemned would be able to move and communicate if not properly anesthetized. Defendants instead attributed any such movement as "involuntary movement which might be misinterpreted as a seizure or an indication of consciousness" without considering that such movements would indicate a lack of anesthetic depth. *See* Attachment A, Report p.8. However, without a test for consciousness, there is a substantial risk that the condemned is insufficiently anesthetized. Thus the Defendants have also displayed deliberate indifference to ensuring that the condemned is properly anesthetized or to account for any contingency planning in the improper mixing and/or administration of the sodium thiopental, thus creating an unnecessary risk of pain and suffering. This makes Tennessee's Current Protocol substantially different from Kentucky's, where there is monitoring for consciousness before the pancuronium bromide is administered..

b. The Committee noted pancuronium bromide, when properly administered, "prevents involuntary muscular movement." (Attachment A, Report p.7). However, using pancuronium bromide to prevent such movement "that *may* interfere with the proper functioning of the IV equipment," *id.*, is not necessary nor narrowly tailored to meet the stated objective. Under the Current Protocol, the prisoner's arms are securely restrained to the gurney (Attachment B, Current Protocol p.64); the catheters are covered with dressing (Attachment B, Current Protocol p.42); the IV lines are taped in place near the catheter, *id.*; and the prisoner's hands are taped in place. (Attachment B, Current Protocol p.43). There is a final inspection of the restraint devices to insure the condemned is secure on the gurney. (Attachment B, Current Protocol p.14). These restraining devices are designed to keep the body parts containing catheters and IV lines

{77}

still; there is no need to also paralyze the prisoner. Moreover, movements observed during actual executions are not caused by proper administration of the first drug, sodium thiopental, which is supposed to place the prisoner under a surgical plane of anesthesia. Movements observed during actual executions are caused when the second drug, pancuronium bromide, begins to suffocate the person and his chest heaves as he gasps for air. Thus, the very drug purportedly used to prevent movements of the body actually induces such movements.

     c.     Because the Current Protocol does not provide careful timing of the injections of the drugs, there may not be time for the pancuronium bromide to cause complete paralysis before the potassium chloride is introduced. The movements that might be caused by potassium chloride (those movements Defendants attempt to prevent by paralyzing the prisoner) may still occur. Thus, Defendants have assumed the known risks associated with using pancuronium bromide without any clear instructions to ensure it will prevent movements.

     d.     The use of pancuronium bromide in the Current Protocol is arbitrary, unreasonable, degrading to human dignity, shocks the conscience and serves no legitimate interest. Because pancuronium bromide causes paralysis, suffocation, and the suffering attendant to such paralysis and suffocation, in 2001, Tennessee declared in the "Nonlivestock Humane Death Act" (TENN. CODE ANN. § 44-17-301, *et seq.*) that pancuronium bromide cannot be used to euthanize animals, because its use is not humane. Where the use of pancuronium bromide is not "humane" to use on non-humans, it is arbitrary and shocks the conscience to claim that its use is "humane" on humans, and its use on humans to cause death violates basic precepts of human dignity.

     e.     Standard medical practice regarding end of life care eschews the use of

{78}

neuromuscular blocking agents like pancuronium bromide.

      f.      The creator of the original three-drug protocol believes pancuronium bromide should be eliminated from the protocol and, if he were to create a protocol today, he would eliminate it. (Attachment II, Cohen, Elizabeth, *Lethal Injection Creator: Maybe It's Time to Change Formula*, www.CNN.com/2007/HEALTH/05/07/lethal.injection/index.html).

      232.     The Current Protocol specifies the use of "100mg/mL." (Attachment B, Current Protocol p.38).

      a.      Pancuronium is not supplied in such a high concentration.

      b.      If the concentration of pancuronium bromide listed in the Current Protocol is not an error, then the Current Protocol cannot be followed.

      c.      Other jurisdictions use Pancuronium supplied in concentrations of one fiftieth to one hundredth of the amount in the Current Protocol.

      d.      If this is an error in the Current Protocol, it demonstrates that unanticipated and undetected errors do occur.

      233.     The Current Protocol fails to ensure the proper storage and effectiveness of pancuronium bromide before its use (assuming it is to effect a quicker death). The Current Protocol acknowledges that pancuronium bromide "must be refrigerated at approximately 40 degrees." (Attachment B, Current Protocol p.36). However, the Current Protocol directs that three hours before the scheduled execution, the pancuronium bromide, and other Lethal Injection Chemicals, will be moved to the Lethal Injection Room. (Attachment B, Current Protocol p.38). The pancuronium bromide could remain in the Lethal Injection Room, at room temperature or higher, for up to 25 hours and 59 minutes before being used. This procedure and handling of

{79}

pancuronium bromide demonstrates deliberate indifference to the unnecessary risk of pain and suffering by failing to ensure the effectiveness of the drug before its use (assuming it is to effect a quicker death) and by failing to provide a contingency plan should the execution not occur at the originally scheduled time.

## COUNT IV

**42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND TENNESSEE CONSTITUTION ARTICLE 1, § 16 BY THE USE OF POTASSIUM CHLORIDE PURSUANT TO THE CURRENT PROTOCOL (DEFENDANTS RAY, BELL, MILLS, HODGE, JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100)**

234.    Plaintiff incorporates the preceding paragraphs in their entirety.

235.    Under the Current Protocol, "100 mL of 2 mEq/mL" of potassium chloride (Attachment B, Current Protocol p.39), or "100 mg/mL of 2mEq/mL" (Attachment B, Current Protocol p.35), is introduced *via* two syringes into the body through a vein, usually in the arm. This method of administering this amount of potassium chloride is inadequate to stop the heart. (Attachment GG, Ramsey Affidavit p.8-9 ¶XXIX - XXXII).

236.    The use of 100 milligrams of potassium chloride, as specified in the Current Protocol, would not likely cause death within a minute. If this dosage is an error, it is a significant error in the Current Protocol and further demonstrates Defendants' inability to understand the dosages of drugs and failures in qualification and skill of those involved in Tennessee's execution process.

237.    It is a pathophysiological impossibility for the heart to succumb to electro mechanical arrest due to the potassium component of the Current Protocol. (Attachment GG, Ramsey Affidavit p.9 ¶XXXII).

{80}

238.    It takes a serum concentration of more than 16 mEq/L (16mmol/L) of potassium to arrest the heart. (Attachment GG, Ramsey Affidavit p.8 ¶XXX).

239.    The autopsy report of Robert Coe reveals that his vitreous potassium was 9 mEq/L (9mmol/L), (Attachment Y, Coe Autopsy Bates p.9) far short of the required minimum 16.4 mEq/L to cause electro mechanical arrest of the heart.

240.    The autopsy report of Philip Workman reveals only that his vitreous potassium level was at some unspecified level above 9 mEq/L (9mmol/L), (Attachment Z, Workman Autopsy Bates p.03, 12), a level far short of the required minimum 16.4 mEq/L to cause electro mechanical arrest of the heart.

241.    The autopsy report of Steve Henley demonstrates that his vitreous potassium was 6 mEq/L (6mmol/L). (Attachment BB, Henley Autopsy Bates p.02, 06). Mr. Henley's potassium level was normal, not elevated, (id.), and far short of the required minimum 16.4 mEq/L to cause electro mechanical arrest of the heart.

242.    Further, as to Mr. Henley in particular, witnesses to the Henley execution observed his skin color turn blue to purple during his execution. (Attachment CC, Affidavit of Stacy Rector p.1).

243.    Mr. Henley's change in skin color is consistent with death by suffocation while his heart continued to beat. (Attachment EE, 2010 Affidavit of Dr. Lubarsky p.7).

244.    According to Dr. Levy, the executions of Robert Coe, Philip Workman, and Steve Henley were carried out in the manner intended by the Tennessee Protocol. *See* ¶¶ 50, 59, and 67, *supra*.

245.    Using an amount of, and method of administering, potassium chloride which does

{81}

not arrest the heart is gratuitous, meaningless and arbitrary and without a legitimate or compelling purpose. potassium chloride serves no legitimate medical purpose during execution. It will not hasten or effect death. It will only inflict excruciating pain if the condemned is not properly anesthetized. *See Hill v. McDonough*, 547 U.S. at 581 (the challenged procedure presents a risk of pain the State can control). Instead, the killing agent will be the pancuronium bromide meaning death by suffocation or asphyxiation.

246.    In the absence of adequate anesthesia, the introduction of potassium chloride creates extreme and excruciating pain. The Current Protocol fails to educate its readers (the Execution Team) about the true nature of potassium chloride – that it would cause extreme pain in someone who is not properly anesthetized. (Attachment B, Current Protocol p.35).

247.    Unlike the Kentucky protocol approved in *Baze*, the Current Protocol lacks any provision for ascertaining the level of the prisoner's anesthetic depth before introduction of the potassium chloride.

248.    If Mr. West remains conscious during the administration of the potassium chloride, he will suffer excruciating pain. The autopsy results from previous Tennessee executions show that, when properly administered, the Current Protocol does exactly that. Due to the paralysis induced by the pancuronium bromide, he will have no alternative reasonable and effective means to communicate the fact that he was not properly anesthetized. He will suffer a terrifying and painful death by suffocation.

{82}

## COUNT V

**42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENT THROUGH ADHERENCE TO THE CURRENT PROTOCOL WHICH FAILS TO PROVIDE ADEQUATE QUALIFICATIONS AND TRAINING OF PERSONNEL TO MINIMIZE THE KNOWN RISKS INVOLVED IN EXECUTION BY LETHAL INJECTION (DEFENDANTS RAY, BELL, MILLS, HODGE, JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100)**

249.     Plaintiff incorporates the preceding paragraphs in their entirety.

250.     TDOC asserts that "[t]he method of finding a suitable blood vessel and maintaining a flow through that blood vessel are considered to be medical matters that will be addressed through standard medical methods and procedures." Accordingly, the execution process, including the IV set-up, location of veins, access to veins, insertion of catheters, monitoring and introduction of the three drug protocol are governed by "standard medical methods and procedures". The Current Protocol fails to comport with those methods and procedures.

251.     In this respect, Tennessee's Current Protocol is substantially different from Kentucky's protocol approved in *Baze*, where similar problems were not found.

252.     Defendants' inadequate selection, education, and training of persons involved in the lethal injection process creates the risk of unnecessary pain and suffering; does not conform with evolving standards of decency; and evinces deliberate indifference to minimizing known risks. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

a.     The Current Protocol fails to indicate what medical training, education, or licensing the IV Team has, if any, and if any medical training, education, or licensing is required for their selection for those positions.   The Current Protocol does not require that the IV Team

{83}

Members be qualified in any particular way. *See* Attachment B, Current Protocol p.32. The Current Protocol does not require the IV Team Members to be current with IV access procedures. *Id.* This renders the IV Team unqualified to perform IV access in an execution context.

      b.      The Current Protocol fails to indicate how persons on the Execution Team are qualified to participate in an execution or what screening, if any, has been done to ensure that these persons do not have a criminal background, mental health issues, personnel and disciplinary issues, drug or alcohol issues. Attachment B, Current Protocol p.32.

      c.      The Current Protocol fails to indicate how the Physician is qualified to participate, how he or she is chosen, by whom he or she is chosen, or what screening, if any, has been done to ensure that the medical doctor does not have a criminal background, mental health issues, personnel and disciplinary issues, drug or alcohol issues. Indeed, the Physician is hardly participating anyway; instead he is physically remote from the procedure, standing in the capital punishment garage.

      d.      The Current Protocol fails to indicate what instruction the Executioner receives, by whom that instruction is given, and what qualifications, education, training, licensing and screening that individual has to provide any such instruction. The Current Protocol only says that "[t]he Executioner receives initial and periodic instruction from a qualified medical professional." (Attachment B, Current Protocol p.33). The Executioner is not required to be certified in IV training. Moreover the Current Protocol fails to define the role of the Executioner; fails to identify the Executioner; how he or she is chosen; by whom he or she is chosen; what qualifications or training he or she has; or what screening, if any, has been done to ensure that the Executioner does not have a criminal background, mental health issues, personnel and

{84}

disciplinary issues, drug or alcohol issues. Even experienced anesthesiologists sometimes err by holding the syringe in the wrong direction, causing a retrograde injection. The Current Protocol fails to provide for an alternative Executioner in the event the primary Executioner is unable to attend an execution.

      e.      The Current Protocol fails to indicate how specialized members of the Execution Team identified as "two (2) EMTs - Paramedic - Certified Emergency Medical Technician" are qualified to participate; by whom they were chosen to participate; or what screening, if any, has been done to ensure that these members do not have a criminal background, mental health issues, personnel and disciplinary issues, drug or alcohol issues. *See* Attachment B, Current Protocol p.32. Moreover, the Current Protocol fails to indicate what role these "EMTs - Paramedic - Certified Emergency Medical Technician" play on the execution team. *Id.*

      f.      The Current Protocol fails to indicate how the "three correctional officers" who "received IV training through the Tennessee Correction Academy by qualified medical professionals" are qualified to participate as part of the IV team; by whom were they chosen to participate; what screening, if any has been done to insure that these specific members do not have a criminal background, mental health issues, personnel and disciplinary issues, drug or alcohol issues; and what screening has been done, if any, to ensure that they can competently perform their duties as part of the IV team. *See* Attachment B, Current Protocol p.32. The Current Protocol fails to specifically indicate that these "three correctional officers" actually make up the IV team. *See* Attachment B, Current Protocol p. 21, 32. In addition, the Current Protocol fails to explain or elaborate on the alleged "IV training through the Tennessee Correction Academy by qualified medical professionals." *See* Attachment B, Current Protocol

{85}

p.32.

253. The Current Protocol fails to indicate what training is required for members of the Execution Team. *See* Attachment B, Current Protocol p.33. The Current Protocol only indicates that Execution Team members are required to read the manual and that "[t]he Warden or his designee holds a class during which the manual is reviewed and clearly understood by all participants." (Attachment B, Current Protocol p.33).

a. The Current Protocol does not explain how the Warden insures that the manual is clearly understood by all participants nor does it explain who teaches the science and medical techniques to be utilized in the manual. *See id.*

b. The Current Protocol fails to include photographs of the lethal injection apparatus and its proper set-up. In contrast, the Current Protocol contains detailed pictures of the apparatus used for execution by electrocution and its proper set-up. The failure to provide such photographs, training and instruction for executions by lethal injection, or to even name the technique to be employed, demonstrates deliberate indifference to the proper administration of an execution by lethal injection and heightens the risk of unnecessary infliction of pain and suffering.

c. The Current Protocol fails to provide training and instructions for using the shortest amount of tubing, extensions and junctions for the IV set-up which will reduce problems associated with blockages, kinks, *etc.*, in the lines. The Current Protocol fails to indicate what kind of junctures are used in the tubing, what kind of stopcock is used, or the size of the IV catheter.

d. The Current Protocol fails to provide training and instructions for removing the

{86}

tourniquet and fails to designate a person to do so. Failure to properly loosen or move the tourniquet will delay or inhibit the delivery of the drugs by the circulation to the central nervous system, thus reducing the effectiveness of any anesthetic properties of the sodium thiopental.

e.     The Current Protocol fails to provide training and specific instructions for mixing the sodium thiopental. The method of mixing the sodium thiopental, as described by Defendant Bell, is not medically accepted. (Attachment AA, 2007 Affidavit of Dr. Lubarsky, ¶17). It is not clear that thiopental can be reliably mixed at 100 mg/mL, as set forth in the Current Protocol. *Id.*

f.     The Current Protocol fails to provide training and specific instructions regarding the effects of the three Lethal Injection Chemicals and their known risks.

g.     Under the Current Protocol, training is conducted with Saline and not the three Lethal Injection Chemicals. (Attachment B, Current Protocol, p.33). Therefore, the Current Protocol fails to provide training using the three-drug protocol where personnel would prepare the drugs, prepare the syringes and push the drugs through the IV lines.

h.     The Current Protocol fails to require, as part of a training program, "a procedure in which each training exercise is critiqued at all levels to address contingencies and the response to those contingencies." (Attachment X, Florida Commission Report p.12).

254.     The Current Protocol fails to account for contingency personnel if one or more members of the designated IV Team, Execution Team, Executioner, or the Physician, cannot participate. By contrast, the Current Protocol for execution by electrocution provides for two electricians to serve as reserves if the designated personnel are unable to perform their duties. (Attachment B, Current Protocol p.65). The failure to provide contingency personnel for execution by lethal injection displays deliberate indifference to the qualifications and training of

{87}

the actual persons performing the execution and the proper administration of the Lethal Injection

Chemicals creating unnecessary risk of pain and suffering during the lethal injection process.

## COUNT VI

**42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENT THROUGH ADHERENCE TO THE CURRENT PROTOCOL WHICH FAILS TO REQUIRE AND INCLUDE, AND FAILS TO COMPORT WITH, ACCEPTED MEDICAL PRACTICES, OR BEST PRACTICES, TO MINIMIZE THE KNOWN RISKS INVOLVED IN EXECUTION BY LETHAL INJECTION (DEFENDANTS RAY, BELL, MILLS, HODGE, JOHN DOE PHYSICIANS 1 - 100, JOHN DOE PHYSICIANS 1-100, JOHN DOE PHARMACISTS 1-100, JOHN DOE MEDICAL PERSONNEL 1-100, JOHN DOE EXECUTIONERS 1-100, JOHN DOES 1-100). IN PARTICULAR, TENNESSEE'S PROTOCOL FAILS TO PROVIDE FOR A CHECK FOR THE INMATE'S LEVEL OF CONSCIOUSNESS AFTER ADMINISTRATION OF SODIUM THIOPENTAL.**

255.    Plaintiff incorporates the preceding paragraphs in their entirety.

256.    The method of finding a suitable blood vessel and maintaining a flow through that blood vessel are considered to be medical matters that must be addressed through standard medical methods and procedures. Accordingly, the execution process including the IV set-up, location of veins, access to veins, insertion of catheters, monitoring and introduction of the three drug protocol are governed by "standard medical methods and procedures. The Current Protocol fails to comport with those methods and procedures.

257.    In this respect, Tennessee's Current Protocol is substantially different from Kentucky's, which provides increased protections.

258.    The Current Protocol wantonly and/or deliberately lacks specific medical requirements and best practices identified by other jurisdictions as being necessary to reduce known risks. *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). Defendants purportedly reviewed the Florida Governor's Commission on Administration of Lethal Injection (Attachment A, Report p.13) which concluded that "the process does require some qualified medical

{88}

personnel to successfully accomplish a humane and lawful execution" (Attachment X, Florida Commission Report, p.5) yet failed to include such specific requirements and qualifications.

a.  The Current Protocol does not provide appropriate medical qualifications and training for the Executioner. *See* Attachment B, Current Protocol p.33.

b.  The Current Protocol does not provide appropriate medical qualifications and training for the Physician. *See* Attachment B, Current Protocol p.20.

c.  The Current Protocol does not provide appropriate medical qualifications and training for the IV Team Members. *See* Attachment B, Current Protocol p.32.

d.  The Current Protocol does not provide appropriate medical qualifications and training for any other members of the Execution Team.

259.  The Current Protocol fails to require drug and alcohol testing for participants in the execution, thus creating a known risk that one or more such participants may be impaired while performing assigned duties. *Compare* Attachment JJ, Florida Protocol p.5).

260.  Under the Current Protocol, two IV lines are established at the same time. (Attachment B, Current Protocol p.42-43). Upon information and belief, this practice is outside of acceptable medical standards of care which call for only one IV line at a single time.

261.  The Current Protocol fails to indicate what qualifications, training, and screening is done to insure that the Execution Team Member who is given this access to the "Lethal Injection Chemicals" (two of which are scheduled narcotics) does not have a criminal background, mental health issues, personnel and disciplinary issues, or drug or alcohol issues. It fails to indicate what qualifications, training, and screening is done to insure that the Execution Team Member who is given this access to the "Lethal Injection Chemicals" is trained and

{89}

qualified at procuring, storing and transporting the Lethal Injection Chemicals.

262.    The Current Protocol fails to provide for a physical examination of the prisoner by qualified personnel to determine an appropriate IV site before the prisoner is strapped to the gurney. Defendants failed to provide for this despite awareness that the Florida Governor's Commission on Administration of Lethal Injection made this recommendation. (Attachment A, Report, Report, p.13; Attachment X, Florida Commission Report, p.10-11). The Current Protocol fails to indicate what Defendants will do if the inmate has small veins or general venous incompetence and which member of the execution team will make a decision surrounding those issues. Small veins or venous incompetence can result in an inability to properly administer a full dosage of anesthetic to the inmate, resulting in an excruciatingly painful and horrifying death. Moreover, the Current Protocol fails to identify any execution team member who has medical training in general venous incompetence. Accordingly, no provisions have been made to develop and implement a procedure to insure that unexpected events regarding access to a venous site are identified and corrected. *Compare* Attachment X, Florida Commission Report, p.11.

263.    Under the Current Protocol, if a catheter cannot be successfully inserted into the antecubital fossa area, other locations for insertion are to occur in a specified order, which includes the wrist as the second preferred location. (Attachment B, Current Protocol p.41). Upon information and belief, accepted medical standards and procedures dictate that the wrist is usually the last location considered because it is too shallow. Thus, the choice of locations for insertion was established with deliberate indifference to current medically sound procedures.

264.    If venous access is inaccessible, whether from previous intravenous drug use or

{90}

other reasons, the Current Protocol utilizes a cutdown procedure. A cut-down is an outdated, dangerous surgical procedure. *See Nelson v. Campbell*, 541 U.S. 637 642 (2004). Engaging in a cut-down without first trying the less painful and less invasive method of percutaneous access represents a profound departure from standard medical methods and the standard of care used in executions in other states.

    a.    The Current Protocol indicates that a cut-down may be used but does not indicate at what point in the procedure the IV Team would resort to this option or who would make the determination that a cutdown is necessary.

    b.    The Current Protocol is silent as to the Physician's qualifications to perform a cutdown. Only 15% of physicians in the United States are qualified to perform a cutdown. Thus, Defendants display wanton and/or deliberate indifference to this fact when they state, "cut-down procedures are not particularly difficult for physicians to perform" and do not require the Physician to have experience in performing cutdowns. (Attachment A, Report p.9). Defendants failed to indicate why alternative procedures to gain venous access were rejected. *See id.*

    c.    Any cutdown procedure is a dangerous and antiquated medical procedure that is rarely performed in the practice of medicine.

    d.    A cutdown procedure involves making a series of sharp incisions through the skin and through several layers of connective tissue, fat, and muscle - all with only local anesthetic – to expose a suitable vein for IV catheterization. The Current Protocol fails to provide for the acquisition, storage and placement of any local anesthetic in the execution chamber.

    e.    A cutdown is a complicated medical procedure requiring equipment and skill that has a very high probability of not proceeding properly in the absence of adequately trained and

experienced personnel, and without the necessary equipment. The Current Protocol fails to provide for persons possessing such training and skill and for the necessary equipment. If done improperly, the cut-down process can result in very serious complications including severe hemorrhage (bleeding), pneumothorax (collapse of a lung which may cause suffocation), improper seating of the catheter resulting in infiltration of the Lethal Injection Chemicals to surrounding tissue and severe pain.

     f.     Cutdowns are out-dated and are only used in clinical situations that are not pertinent to executions by lethal injection, including emergency scenarios where there has been extensive blood loss, and in situations involving very small pediatric patients and premature infants.

     g.     Cutdowns have been replaced by the percutaneous technique which is less invasive, less painful, less mutilating, faster, safer, and less expensive than the cut-down technique.

     h.     The use of a cutdown as a back-up before trying to find percutaneous access is a profound departure from standard medical methods and from the standard of care used in executions in other jurisdictions.

     i.     To use a cutdown as the backup method of achieving IV access defies contemporary medical standards and would be a violation of any modern standard of decency.

     j.     The Current Protocol is silent on the procedures that will be followed by the Physician should a cutdown become necessary. *See* Attachment B, Current Protocol p.41, 67.

     k.     The Current Protocol gives the Physician complete discretion to "choose a different method to find an IV site." (Attachment B, Current Protocol p.67). The Current

{92}

Protocol is completely silent on permissible options for finding an IV site and obtaining venous access and whether they are medically sound, constitutional and minimize unnecessary pain. The Protocol is silent as to the Physician's qualifications and training to perform "a different method" of inserting the primary IV line.

265.     The Current Protocol fails to indicate which member of the Execution Team, if any, is responsible for loosening the tourniquets or restraining straps. *See* Attachment B, Current Protocol p.41-42. The failure to properly loosen the tourniquets or restraining straps on an inmate can result in an inability to properly administer a full dosage of anesthetic to the inmate, resulting in an excruciatingly painful and horrifying death. Failure to loosen and remove is a known risk and has occurred in the State of Missouri.

266.     The Current Protocol fails to indicate whose responsibility it is, if any, to watch the IV lines for leaks in the tubing, junctions, and valves during the administration of the Lethal Injection Chemicals and what member(s) of the Execution Team should do when a leak is found. *See* Attachment B, Current Protocol p.43. This is substantially different from Kentucky. A leak in the tubing, junctions, or valves can result in the failure to properly administer a full dosage of anesthetic to the inmate, resulting in an excruciatingly painful and horrifying death. Problems with IV lines detaching and spilling chemicals is a known risk which has occurred in the State of Texas. The only monitoring prescribed by the Current Protocol during the administration of the Lethal Injection Chemicals is "by watching the monitor in his room which displays the exact location of the catheter(s) by means of a pan-tilt zoom camera" and allows for "monitoring the catheter sites for swelling or discoloration." (Attachment B, Current Protocol p.43). The person responsible for such monitoring is also responsible for recording time data on the Chemical

{93}

Administration Record. *See* Attachment B, Current Protocol p.43. Thus, there is no monitoring of the IV tubing, junctions, valves or the drip chamber during the administration of Lethal Injection Chemicals. Moreover, the monitoring of an IV site from a remote camera is not medically proper. The use of tape over the IV lines and dressing over catheter further obscures view. (Attachment B, Current Protocol p.40-42). In order to insure that an IV does not migrate, infiltrate, move, and is working properly, the IV site must be monitored from the bedside. The Current Protocol does not provide for anyone to monitor the IV site from the bedside, nor is there any qualified medical personnel in the room to do any personal, medical monitoring of the process. *See* Attachment B, Current Protocol p. 43.

267. The Current Protocol does not remedy the insufficient view from the Lethal Injection Room of the condemned and the lethal injection apparatus. The Supreme court noted that Kentucky's protocol required direct monitoring for IV problems. *Baze*, 553 U.S. at 56.

268. The Current Protocol does not provide any real time measurement of the prisoner's body functions and vital signs or any real time measure of anesthetic depth. *Id. compare with* Attachment JJ, Florida Protocol, p.9.

269. The Current Protocol fails to indicate what medical training, education, or licensing the IV Team, the Execution Team and the Physician have, if any, in taking remedial action in the event of problems with the administration and delivery of the Lethal Injection Chemicals. This is a risk known to Defendants as the Florida Governor's Commission found there were inadequate guidelines, inadequate training, a failure of leadership and a failure in communication when complications arose during the execution of Angel Diaz. (Attachment X, Florida Commission Report, p.8-9).

{94}

a. The Current Protocol fails to provide instructions for insuring that a successful IV access is maintained throughout the execution. This is a risk known to Defendants which occurred in the execution of Angel Diaz in Florida. (Attachment X, Florida Commission Report p.8-9).

b. The Current Protocol fails to indicate what any member of the Execution Team will do if the catheter migrates during the lethal injection. *See* Attachment B, Current Protocol p.67. The migration of an IV catheter can result in an inability to properly administer a full dosage of anesthetic to the inmate, resulting in an excruciatingly painful and horrifying death.

c. The Current Protocol fails to indicate what any member of the Execution Team will do if the inmate has a collapsed vein, perforation or leakage of the vein, or a blown vein from the pressure of the syringe plunger. *See* Attachment B, Current Protocol p.41-42. A collapsed, torn, or blown vein can result in an inability to properly administer a full dosage of anesthetic to the inmate, resulting in an excruciatingly painful and horrifying death. Problems with collapsed veins is a known risk which has occurred during training sessions in Tennessee and in the State of Ohio during the Clark execution. *See infra at* p. 33, oo.

d. The Current Protocol fails to indicate the manner in which IV tubing, valves, saline solution, *etc.*, shall be modified or repaired if needed, the minimum qualifications and expertise required of the person(s) who has discretion to decide to attempt such action, and the criteria that shall be used in exercising such discretion.

e. The Current Protocol does not indicate the minimum qualifications and expertise required of the person(s) given the responsibility and discretion to order the staff to divert from the established Protocols if necessary to avoid inflicting severe and unnecessary pain and

{95}

suffering on the condemned, and the criteria to be used in exercising this discretion. Further the Current Protocol does not indicate the minimum qualifications and expertise required of the person(s) given the responsibility and discretion to insure that appropriate procedures are followed in response to unanticipated problems or events arising during the lethal injection and the criteria that shall be used in exercising this discretion.

270.    The Current Protocol fails to indicate the length of time between the administration of each drug. *See* Attachment B, Current Protocol p.43-44. This detail is important to insure that an inmate is adequately anesthetized by the sodium thiopental prior to the introduction of the pancuronium bromide and potassium chloride. Under the Current Protocol it appears that the rate of drug administration and timing between drugs is arbitrary and not designed to insure the prisoner is properly anesthetized.

271.    The Current Protocol fails to charge anyone with the essential duty of monitoring the inmate during the administration of the drugs to assure that the sodium thiopental (anesthesia) is working properly before administration of the pancuronium bromide and potassium chloride. *See* Attachment B, Current Protocol p. 43-44. *See also* Attachment AA, 2007 Affidavit of Dr. Lubarsky, p.6 ¶23. *Compare with* Attachment JJ, Florida Protocol, p.8. This is a material difference with the Kentucky protocol approved in *Baze*.

272.    The Current Protocol fails to indicate the presence of an anesthesiologist or a certified nurse anesthetist who could properly monitor consciousness. *See* Attachment B, Current Protocol p.43-44. There is no member of the Execution Team qualified to monitor the anesthetic depth of the inmate. The Current Protocol fails to indicate the presence of any medical technology that might be used to monitor consciousness. *See* Attachment B, Current Protocol

{96}

p.43-44. The Current Protocol further fails to provide for any check for consciousness.

273.    The Current Protocol fails to include safeguards that would protect the prisoner in the event a stay of execution is entered after the lethal injection process has begun.

a.    The Current Protocol does not indicate what training, education, or licensing the IV Team, the Execution Team and the medical doctor has, if any, in reviving the condemned in the event a stay is issued after the execution begins.

b.    The Current Protocol does not provide for emergency life saving equipment in the execution chamber. Thus, the Current Protocol fails to provide any protections to prevent a prisoner from being wrongly executed should a reprieve be granted after the process has begun but before death has occurred. Here, the Current Tennessee Protocol is, again, substantially different from Kentucky's, which provides for such a contingency. *Baze*, 553 U.S. at 46.

c.    At any time before the potassium chloride is administered, the prisoner could be readily resuscitated if trained personnel and routine resuscitation medication and equipment were present at the execution site. Even after the potassium chloride is administered, resuscitation would still be possible, although it would be more challenging. Any resuscitation, however, would require the close proximity of the necessary equipment, medication, and properly trained personnel. The omission of such personnel and equipment under the Current Protocol further undermines the constitutionality of the procedure.

## COUNT VII

**42 U.S.C. § 1983: VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND TENNESSEE CONSTITUTION ARTICLE 1, § 16 BY THE USE OF AN EXECUTION PROTOCOL WHICH CAUSES DEATH BY THE SUFFOCATION OF A CONSCIOUS INMATE.**

274.    Plaintiff incorporates the preceding paragraphs in their entirety.

{97}

275.     In addition to Defendants' violation of the Eighth Amendment and Tennessee Constitution Article 1, § 16 through the choice to use sodium thiopental, pancuronium bromide and potassium chloride, the choice to use such drugs in the combination and method of administration required by the Tennessee Protocol will result in the infliction of unnecessary and severe pain and suffering upon Mr. West if he is executed in the manner required by the Tennessee Protocol.

276.     This infliction of unnecessary and severe pain and suffering upon Mr. West will not only occur in the event of the Protocol being administered improperly, but rather when it is administered exactly as set forth in the Current Protocol. This is demonstrated by every autopsy report of an inmate executed under Tennessee's lethal injection protocol.

277.     Because, under *Baze v. Rees*, 553 U.S. 35 (2008), a protocol which poses merely a substantial risk of unnecessary severe pain and suffering, violates the Eighth Amendment and Tennessee Constitution Article 1, § 16, a protocol which does, in fact, cause substantial pain and suffering when carried out in the manner intended must necessarily violate the Eighth Amendment and Tennessee Constitution Article 1, § 16.

278.     Moreover, the Defendants' deliberate indifference to using the Tennessee Protocol knowing that the autopsy results prove ineffective the use of sodium thiopental and potassium chloride and that inmates are actually executed by means of suffocation violates the Eighth Amendment and Tennessee Constitution Article 1, § 16.

{98}

## COUNT VIII

### *Request for Declaratory Judgment*

**28 U.S.C. § 1331:    Violations of the Federal Controlled Substances Act and the Federal Food, Drug and Cosmetic Act.**

279.    The three drugs used in the Tennessee Protocol, sodium thiopental, pancuronium bromide and potassium chloride, are regulated by the Federal Controlled Substances Act and the Federal Food, Drug & Cosmetic Act.

280.    According to the Tennessee Protocol, Defendants intend to prescribe, procure, distribute and administer sodium thiopental, pancuronium bromide and potassium chloride to Mr. West for the purpose of effecting his death by execution.

281.    Defendants, other than Physician A and John Doe Physicians 1-100, are not physicians licensed by law to prescribe or administer the drugs used under the Tennessee Protocol.

282.    Under the Tennessee Protocol, sodium thiopental, pancuronium bromide and potassium chloride will be filled by a pharmacist and dispensed and administered for use without physician supervision and without the prescription of a practitioner issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice, in violation of the Federal Controlled Substances Act and the Federal Food, Drug & Cosmetics Act.

283.    This Court has jurisdiction under 21 U.S.C. § 322 (enjoining violations of the Federal Food, Drug & Cosmetic Act); under 28 U.S.C. § 1331 (actions arising under the Constitution or laws of the United States); under 28 U.S.C. § 1651 (the All Writs Act); and under

{99}

28 U.S.C. § 2201(a) (in that the purpose of this action is to secure declaratory relief).

284. Under the Supremacy Clause of the United States Constitution, the Defendants are required to obey the Federal Controlled Substances Act, ("CSA"), 21 U.S.C. §§ 801, *et seq.*, and the Federal Food, Drug & Cosmetic Act, ("FD&C Act"), 21 U.S.C. §§ 301, *et seq.*

285. Mr. West seeks equitable relief in the form of a declaratory judgment clarifying that the safeguards contained within the CSA and FD&C Act apply to his lethal injection in Tennessee and that Defendants are violating or intend to violate these statutes.

286. Mr. West seeks a declaratory judgment that the Defendants' means for obtaining and administering the lethal injection chemicals, pursuant to the Tennessee Protocol, violate the CSA and the FD&C Act.

287. The United States Government could prosecute the Defendants for violating the CSA and the FD&C Act.[8] However, in this action Mr. West is not seeking to force the Food and Drug Administration, ("FDA"), or any other United States governmental agency or official to enforce the federal laws. Because Mr. West is not seeking such enforcement, neither the Federal Administrative Procedures Act nor *Heckler v. Chaney,* 570 U.S. 821 (1985), apply to this action.

288. Mr. West only seeks a declaration that the Defendants' intended actions under the Tennessee Protocol, as applied to him, will violate the CSA and the FD&C Act.

### Federal Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, (Sodium Thiopental)

289. Mr. West incorporates, as if fully set forth herein, the preceding paragraphs in their entirety.

---

[8]*See Gonzales v. Raich,* 545 U.S. 1 (2005).

290. In the Controlled Substances Act ("CSA"), Congress declared that the illegal manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people. 21 U.S.C. § 801(2).

291. Title 21 U.S.C. § 812 creates five schedules of controlled substances.

292. The Tennessee Protocol requires dispensing and administration of sodium thiopental, which is a schedule III (b)(1) controlled substance. *See e.g.* Attachment B, Current Protocol p.35-44.

293. The CSA, 21 U.S.C. §§ 822, 829; 21 C.F.R. 1301.11, 1306.04(a), calls for controlled substances, including sodium thiopental, to be dispensed and administered with the prescription of a practitioner issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice and possessing a registration under the CSA.

294. The term "administer" refers to the direct application of a controlled substance to the body of a patient by a practitioner or his authorized agent, or the patient at the direction and in the presence of the practitioner, whether such application be by injection, inhalation, ingestion, or any other means. 21 U.S.C. § 802(2).

295. The term "dispense" means to deliver a controlled substance to an ultimate user, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the compounding necessary to prepare the substance for such delivery.[9]

---

[9]Every person who dispenses, or proposes to dispense, any controlled substance, shall obtain a registration for such purposes. 21 U.S.C. § 822(2); *see also* 21 C.F.R. 1301.11.

{101}

Title 21 U.S.C. §802(10).

296.  Under 21 U.S.C. § 829(b), unless dispensed directly by a practitioner other than a pharmacist, to an ultimate user, schedule III controlled substances, including sodium thiopental, may be dispensed only upon a prescription by a practitioner licensed by law to administer such a drug.

297.  Under the Tennessee Protocol, the Defendant Warden Bell or his designee will procure sodium thiopental from Defendant John Doe Procurement Officer at RMSI and/or John Doe Procurement Officer at DSNF. Defendant John Doe Executioner will take possession and maintain custody of the sodium thiopental until its use during an execution. (Attachment B, Current Protocol p.36).

298.  The Defendants' actions, described in the preceding paragraph, will violate the CSA. *See, e.g.,* 21 U.S.C. § 829.

299.  Rules governing the issuance, filling and filing of prescriptions under § 829 are set forth in the Code of Federal Regulations, 21 C.F.R. 1306.01, *et seq.*

300.  A prescription for a controlled substance, such as sodium thiopental, must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. 21 C.F.R. 1306.04.

301.  In violation of the CSA and 21 C.F.R. 1306.04, a prescription to dispense sodium thiopental for Mr. West's execution will not be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

302.  A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice. 21 C.F.R. 1306.06.

{102}

303.     In violation of the CSA and 21 C.F.R. 1306.06, a prescription to dispense sodium thiopental for Mr. West's execution will not be filled by a pharmacist, acting in the usual course of his professional practice.

304.     Any person, including the Defendants, issuing or filling an order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research shall be subject to penalties under the CSA. 21 C.F.R. 1306.04.

305.     Under 21 U.S.C. § 841(f), any person who knowingly distributes, *i.e.*, delivers, a controlled substance or listed chemical in violation of the CSA is subject to criminal penalties.

306.     In addition, under 21 U.S.C. § 843(e), any person convicted under the act may be enjoined from engaging in any transaction involving a listed chemical. *See also* 21 U.S.C. § 843(f) (injunctions).

307.     Accordingly, Mr. West requests the Court to declare that Defendants' actions in prescribing, obtaining, distributing and/or administering sodium thiopental for Mr. West's execution have, or will, violate the CSA.

### Federal Food, Drug & Cosmetic Act, 21 U.S.C. §§ 301, *et seq.*
### (Sodium thiopental, pancuronium bromide and potassium chloride)

308.     Mr. West incorporates, as if fully set forth herein, the preceding paragraphs in their entirety.

309.     The purpose of the FD&C Act is to protect the public by limiting the use of dangerous drugs to medically supervised situations. In particular, one of the FD&C Act's core objectives is to ensure that regulated drugs are both "safe" and "effective" for their intended

{103}

use.[10]

310.    Sodium thiopental, being a controlled substance, must be dispensed by prescription as required by the FD&C Act.  21 C.F.R. 290.1.

311.    Pancuronium bromide and potassium chloride are listed drugs that can only be dispensed pursuant to a prescription and used under the supervision of a licensed practitioner, as required by the FD&C Act. *Approved Drug Products with Therapeutic Equivalence Evaluations*, available at: http://www.fda.gov/cder/orange/default.htm; 21 C.F.R. 314.3 (b) (defining "listed drug" as a drug with an effective approval in the current edition of FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations," otherwise known as the "Orange Book.").

312.    Under the FD&C Act, 21 U.S.C. § 321(g)(1), the term "drug" means (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals.

313.    Pancuronium bromide and potassium chloride are drugs within the scope of 21 U.S.C. § 321(g)(1).

314.    Sodium thiopental, pancuronium bromide and potassium chloride are prescription drugs regulated, in part, by 21 U.S.C. § 353.

315.    The term "prescription drug" is defined in 21 U.S.C. § 353(b).  A prescription

---

[10]*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

drug by its nature is not safe for use except under the supervision of a licensed practitioner. 21 U.S.C. § 353(b)(1)(A).[11]

316.     Under the Tennessee Protocol, and in violation of the FD&C Act, the use of sodium thiopental, pancuronium bromide and potassium chloride for Mr. West's execution will not occur under the supervision of a licensed practitioner.

317.     Under the FD&C Act, prescription drugs, including sodium thiopental, pancuronium bromide and potassium chloride, shall be dispensed only upon a prescription of a practitioner licensed by law to administer such drug. 21 U.S.C. § 353(b)(1)(B).[12]

318.     In violation of the FD&C Act, a prescription to obtain sodium thiopental, pancuronium bromide and potassium chloride for Mr. West's execution will not be dispensed upon a prescription of a practitioner licensed by law to administer such drug.

319.     The FDA has not authorized the use of sodium thiopental, pancuronium bromide, and potassium chloride for lethal injections.

320.     Although prescribing and administering prescription drugs for "off-label" use is not entirely prohibited, such use can only be with the authority of a health care practitioner to prescribe or administer to a patient for a condition or disease within a legitimate health care practitioner-patient relationship. 21 U.S.C. § 396.[13]

---

[11]*United States v. Articles of Drug*, 625 F.2d 665, 669-70 (5th Cir. 1980) (defining "prescription drug").

[12]The act of dispensing a drug without a prescription is contrary to the provisions of 21 U.S.C. § 353. Such an act shall be deemed to be an act which results in the drug being misbranded. 21 U.S.C. § 353(b)(1). The misbranding of a drug is prohibited by § 353(a).

[13]*See Buckman Co. v. Plaintiff's Legal Committee*, 531 U.S. 341, 349-50 (2001) (discussing "off-label" usage of medical devices).

{105}

321. Under the Tennessee Protocol, and in violation of the FD&C Act, no practitioner intends to prescribe or administer sodium thiopental, pancuronium bromide, and potassium chloride for a condition or disease of Mr. West within a legitimate health care practitioner-patient relationship.

322. Accordingly, Mr. West requests the Court to declare that Defendants actions in prescribing, obtaining, distributing and/or administering sodium thiopental, pancuronium bromide and potassium chloride for Mr. West's execution have, or will, violate the FD&C Act.

## CONCLUSION

323. Because Tennessee's lethal injection protocol requires no check for consciousness after the administration of Sodium Thiopental, it is materially and substantially different from Kentucky's protocol, approved in *Baze v. Rees*, 553 U.S. 35 (2008). More importantly, the three autopsies performed on inmates who have been executed by lethal injection in Tennessee demonstrate that inmates are not being properly anesthetized, and are, therefore, conscious, when the Pancuronium Bromide and the Potassium Chloride are being administered. These most important facts, in addition to the others enumerated throughout this Complaint, establish that the issues herein were not resolved by the Supreme Court's ruling in *Baze*. Mr. West's case is materially different and must be fully reviewed.

324. Although it is possible to conduct executions in a constitutionally compliant manner, Defendants have chosen not to do so.

325. Defendants have chosen a method of execution which will cause unnecessary and serious pain and suffering.

326. According to the Tennessee Protocol, Defendants intend to prescribe, procure,

{106}

distribute and administer sodium thiopental, pancuronium bromide and potassium chloride to Mr. West for the purpose of effecting his death, all in violation of federal law.

327. In every lethal injection execution in Tennessee where an autopsy was conducted the execution was performed according to the protocol.

328. In every lethal injection execution in Tennessee where an autopsy was conducted the condemned inmate was not sufficiently anesthetized.

329. Mr. West will not be sufficiently anesthetized if the Tennessee lethal injection protocol is performed as intended. Accordingly, Mr. West will suffer severe pain from the administration of pancuronium bromide and potassium chloride.

330. Defendants' use of sodium thiopental, pancuronium bromide, and potassium chloride under the Tennessee Protocol causes unnecessary pain and prolonged suffering and/or does not conform with evolving standards of decency. Under the Tennessee Protocol, sodium thiopental will not sufficiently anesthetize Mr. West; pancuronium bromide will paralyze and suffocate Mr. West to death; and, the intravenous injection of potassium chloride will cause Mr. West severe pain.

331. The Tennessee Protocol is not substantially similar to Kentucky's protocol.

332. The Tennessee Protocol poses a substantial risk of serious harm that Mr. West will suffer unnecessary and serious pain and suffering.

333. Defendants could choose to use a different protocol that will not cause severe and unnecessary pain to Mr. West. *See Harbison*, 511 F.Supp.2d at 879.

334. Defendants enacted the Tennessee Protocol with deliberate indifference to the substantial risk of serious pain.

{107}

335. Defendants intend to execute Mr. West under the Tennessee Protocol with knowledge, whether actual or imputed, that the protocol has not sufficiently anesthetized those executed and will not sufficiently anesthetize Mr. West.

336. Defendants intend to execute Mr. West under the Tennessee Protocol with knowledge, whether actual or imputed, that the use of pancuronium bromide under the protocol will not arrest his heart but will cause excruciating pain.

337. Defendants intend to execute Mr. West under the Tennessee Protocol with knowledge, whether actual or imputed, that the protocol will cause his death by suffocation.

## COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF

338. Administration of the Tennessee Protocol, as written and performed as intended, will not properly anesthetize Mr. West from the pain caused by the injections of pancuronium bromide and potassium chloride.

339. The use of pancuronium bromide under the Tennessee Protocol to paralyze and suffocate Mr. West will subject him to a painful and protracted death. Moreover, it serves no legitimate penological purpose.

340. If pancuronium bromide is administered, paralyzing Mr. West during the execution procedure, he will have no alternative "reasonable and effective means of communication" to communicate that he was not properly anesthetized.

341. Tennessee's protocol, as designed, results in execution by suffocation which is constitutionally impermissible. Thus, pancuronium bromide serves no legitimate purpose.

342. Enjoining the use pancuronium bromide will remove suffocation as the means to effectuate death.

{108}

343. Enjoining the use of pancuronium bromide will have no appreciable impact on institutional procedures nor the State's interest in executing condemned inmates. The State of Tennessee has already determined that a one-drug protocol is a viable option that will be implemented if the three-drug protocol is declared unconstitutional.

344. Conscious internal burning caused by the intravenous administration of potassium chloride under the Tennessee Protocol constitutes unnecessary physical and psychological pain in violation of the Eighth Amendment.

345. Potassium chloride, as used in the Tennessee Protocol, does not arrest the heart. It serves no legitimate penological purpose.

346. Enjoining the use of potassium chloride will have no appreciable impact on the correctional institution nor the State's interest in executing its condemned inmates. The State of Tennessee has already determined that a one-drug protocol is a viable option that will be implemented if the three-drug protocol is declared unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Mr. West respectfully requests:

347. Temporary, preliminary and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing Mr. West by lethal injection using the Tennessee three-drug lethal injection protocol.

348. In the event that the Tennessee Protocol is not enjoined in its entirety as violating the Eighth and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from administering the short acting barbiturate, sodium thiopental, in the manner

{109}

prescribed by the Tennessee Protocol, which does not render the inmate unconscious, and thereafter subjects him to a horrifying and excruciatingly painful death through the use of pancuronium bromide and potassium chloride.

349.    In the event that the Tennessee Protocol is not enjoined in its entirety as violating the Eighth and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from administering pancuronium bromide during the execution process which serves no legitimate purpose but paralyzes the prisoner and causes suffocation or asphyxiation.

350.    In the event that the protocol is not enjoined in its entirety as violating the Eighth and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from administering potassium chloride during the execution process which serves no legitimate purpose, does not arrest the heart, but causes excruciating internal burning.

351.    In the event that the protocol is not enjoined in its entirety as violating the Eighth and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from allowing personnel who lack sufficient training, credentials, certification, experience, or proficiency to conduct a lethal injection procedure which is materially different from the Kentucky protocol addressed in *Baze* and which thereby needlessly poses a substantial risk of a conscious prisoner experiencing a horrifying and excruciatingly painful death.

352.    Mr. West requests a declaratory judgment that carrying out a lethal injection using sodium thiopental, when the sodium thiopental is neither dispensed nor administered with the

{110}

prescription of a practitioner issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice and possessing a registration, violates the Federal Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*

353.   Mr. West requests a declaratory judgment that carrying out a lethal injection with sodium thiopental, pancuronium bromide, and potassium chloride, without the supervision of a licensed practitioner nor dispensed upon a prescription of a practitioner licensed by law to administer such drugs, violates the FD&C Act, 21 U.S.C. §§ 301, *et seq.*

354.   Mr. West requests a declaratory judgment that carrying out a lethal injection with sodium thiopental, pancuronium bromide, and potassium chloride, that have not been approved by the FDA for use in lethal injections violates the FD&C Act, 21 U.S.C. §§ 301, *et seq.*

355.   Mr. West requests a declaratory judgment that carrying out a lethal injection with sodium thiopental, pancuronium bromide, and potassium chloride, where no practioner intends to prescribe or administer the drugs for a condition or disease of Mr. West within a legitimate health care practitioner-patient relationship, violates the FD& C Act, 21 U.S.C. §§ 301, *et seq.*

356.   Any further relief that this Court finds necessary and just.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY: _Steph___ a. Ferrell_
Stephen A. Ferrell
Assistant Federal Community Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979
Fax: (865) 637-7999
Stephen_Ferrell@fd.org

MILLER & MARTIN, LLP

_Roger W. Dickson_ *by SAF.*
Roger W. Dickson, Esquire
832 Georgia Avenue, Suite 1000
Chattanooga, TN 37402
phone: (423) 756-6600
fax:     (423) 785-8480
rdickson@millermartin.com

{112}

## CERTIFICATE OF SERVICE

I, Stephen A. Ferrell, hereby certify that a true and correct copy of the foregoing

document was hand delivered to:

> Mark A. Hudson
> Senior Counsel
> Office of Attorney General
> 425 Fifth Avenue North
> P. O. Box 20207
> Nashville, TN 37243
> Mark.A.Hudson@state.tn.us

this the 28th day of October, 2010.

Stephen A. Ferrell

{113}